RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0405p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOSEPH LEWIS CLARK,

　　　　　*Petitioner-Appellant,*

　　　*v.*

BETTY MITCHELL,

　　　　　*Respondent-Appellee.*

No. 01-4210

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-02398—Dan A. Polster, District Judge.

Argued: June 8, 2005

Decided and Filed: October 4, 2005

Before: MERRITT, GILMAN, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** George C. Pappas, Akron, Ohio, for Appellant. Stephen E. Maher, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** George C. Pappas, Akron, Ohio, Kerry O'Brien, Akron, Ohio, for Appellant. Stephen E. Maher, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee.

ROGERS, J., delivered the opinion of the court, in which GILMAN, J., joined. MERRITT, J. (pp. 17-22), delivered a separate dissenting opinion.

_____

## OPINION

_____

ROGERS, Circuit Judge. The petitioner, Joseph Clark, appeals the district court's denial of his petition for a writ of habeas corpus. An Ohio state court had sentenced Clark to death for the murder of a convenience store clerk, David Manning, during an armed robbery of the store. On appeal, Clark alleges that he was denied the effective assistance of counsel by virtue of (1) his trial counsel's failure to obtain a neuropsychologist and pharmacologist to testify at Clark's suppression hearing and trial about Clark's inability to waive his rights against self incrimination voluntarily and knowingly; and (2) trial counsel's failure to obtain and introduce evidence, at Clark's mitigation hearing, of Clark's organic brain syndrome, drug addiction and withdrawal, and additional evidence

1

of Clark's troubled childhood.[1]  For the following reasons, we affirm the district court's denial of the writ.

## I. Background

The facts of this case, set forth below, are excerpted from *State v. Clark*, 527 N.E.2d 844, 846-47 (Ohio 1988):

> On the night of January 13, 1984, David A. Manning, an employee of the Clark service station at 3070 Airport Highway in Toledo, was shot and killed during an armed robbery of the establishment. The record indicates that defendant-appellant, Joseph L. Clark, entered the service station at approximately 9:00 p.m. armed with a drawn .32 caliber revolver. The victim was working alone and appellant demanded money. According to a statement made by appellant to Toledo police Detective Sergeant Larry Przeslawski, the victim told appellant that there was no money, but appellant repeated his demand for money. The victim then walked to the back room of the service station, returned to the counter, handed appellant approximately $60 from the cash drawer and told him that was all of the money on the premises. Appellant "told him it wasn't all of it." The victim responded that there was no more money, but reached down and produced an envelope containing more cash. According to appellant's statement, the victim then tried to "force his way on me [appellant]" whereupon appellant shot Manning once in the right upper chest. Appellant then ran out the service station door to his car and drove home.

> Shortly thereafter, two Toledo police officers arrived on the scene in response to a silent alarm. One of the officers walked through the service station without seeing anyone. Upon looking further, he found the victim slouched behind the service counter.

> On January 16, 1984, appellant was arrested after allegedly committing an assault and robbery at the Ohio Citizens Bank. The arresting officer found a .32 caliber revolver in appellant's coat pocket.

> The next day, appellant, with the assistance of an appointed public defender, was arraigned in the Toledo Municipal Court for the assault and robbery at the bank. The public defender was aware that appellant was a suspect in the Manning murder, and advised appellant not to discuss it with anyone but him. Later that day, the record indicates that appellant tried to hang himself in his jail cell. Consequently, appellant was taken to St. Vincent's Medical Center for examination.

> On January 23, 1984, appellant was released from the hospital and taken to the Toledo Police Detective Bureau where he was questioned by Detective James Lagger and Detective Sergeant Przeslawski. The detectives asked appellant if he was under the influence of alcohol or drugs, and appellant responded that he was not. The detectives then gave appellant a standard form containing his rights as established in *Miranda v. Arizona* (1966), 384 U.S. 436 . . . . Appellant then read each paragraph of the *Miranda* warnings out loud. After each paragraph was read,

---

[1] Throughout his brief, Clark also appears to allege that his confession should have been suppressed because Clark was questioned by the police without a lawyer present at a time when Clark had been appointed a lawyer for a distinct robbery and assault charge. This issue was not certified for appeal, however, and thus is not properly before us. Moreover, Clark's argument is contrary to well-established law. *See Texas v. Cobb*, 532 U.S. 162 (2001).

the detectives asked appellant if he understood what he had read.  Appellant responded each time that he understood what he had read and thereupon initialed each paragraph.  After reading his rights, appellant recited and signed the portion of the form waiving his *Miranda* rights.

Subsequently, appellant was interrogated by the detectives for a period covering one and three-fourths hours.  Appellant was then moved to another room where his statements were tape recorded.  At that time, Sgt. Przeslawski again read appellant his *Miranda* rights, and appellant made a statement about a robbery-murder at a Lawson's store in Toledo.  After making this statement, the appellant was given another chance to hear his *Miranda* rights recited when the tape was replayed for him. Eventually, appellant made a tape-recorded statement confessing to the murder of Manning after his *Miranda* rights were again recited to him.  The detectives gave appellant an opportunity to make any corrections in his statement upon replaying the tape for him.   Appellant offered no corrections, additions or changes to his tape-recorded statements relating to the Manning murder.

Following Clark's indictment for Manning's murder, Clark challenged the voluntariness of his statement to the police, and an evidentiary hearing was held on the issue.  At the suppression hearing, Dr. Emanuel Taney, a psychiatrist, testified on behalf of Clark.  Although Dr. Taney had not examined Clark, Dr. Taney had reviewed the medical records from the hospitalization following Clark's suicide attempt, as well as Clark's juvenile records, various police documents, and the court's diagnostic and treatment reports.  Based on a review of these records, Dr. Taney noted that Clark's mental function would be considered "borderline defective" based on his reported I.Q. of 75. Dr. Taney also concluded that Clark suffered from acute brain damage and chronic impairment of his mental functioning at the time of his confession (apparently as a result of Clark's recent suicide attempt).  Taney testified that Clark's impaired mental condition would have interfered with Clark's ability to make choices in an informed and reasonable manner and would have rendered him more susceptible to pressure or duress from others.

The prosecution offered in response the testimony of the officers who interrogated Clark and the testimony of Clark's attending physician, who concluded that, from a medical-neurological standpoint, Clark was capable of making a decision on waiving his rights.  Following the suppression hearing, the state trial court determined that Clark voluntarily and knowingly waived his right against self-incrimination.  Clark's confession was subsequently introduced at trial.

On November 6, 1984, Clark was found guilty of the aggravated murder of Manning while committing aggravated robbery. As part of its verdict, the jury also found appellant guilty of the aggravating circumstance, as charged in the specification of the indictment, that Clark was committing, or fleeing immediately after committing, aggravated robbery and that Clark was the principal offender.

At the sentencing phase of the proceedings, Clark's counsel called several witnesses to testify on Clark's behalf.  Dr. Hy Kisin, a clinical psychologist, had examined Clark on two occasions for a total of approximately four hours. Dr. Kisin found it significant that Clark had been abusing the drug Preludin and that he was addicted to the narcotic drug Dilaudid.  Dr. Kisin described the traumatic effect on Clark of his father's unexpected death.  Dr. Kisin testified that Clark's father had disappeared under mysterious circumstances and was found, nine days later, dead in the rear seat of an automobile with another women.  Dr. Kisin testified that Clark's father's death had a negative impact on Clark and left Clark without significant control in his life.  Dr. Kisin testified that Clark "at best, operates on a dull normal level of intelligence and at worst in a borderline retarded way."  Dr. Kisin testified that Clark also suffered from a "blunted" affect and did not have a normal range for expressing emotions.  Dr. Kisin stated that Clark's need for drug

money had a contributing effect to Clark's crimes. Dr. Kisin further opined that Clark shot Manning as a result of a perceived threat and that Clark did not intend to kill Manning. Dr. Kisin also concluded that Clark would be able to conform and adjust his behavior to function adequately in a prison environment.

Clark's counsel also called other witnesses to testify on Clark's behalf at sentencing. Stephen McConnell, a professor of sociology, testified that the death penalty did not have a deterrent effect on the crime rate in local communities and that the imposition of the death penalty in this case would not have a deterrent effect on the commission of similar crimes. Clark's mother, Erma Clark, testified about Clark's childhood. Ms. Clark testified that Clark was a quiet child with few friends, that Clark's father had died under unusual circumstances when Clark was a teenager, and that Clark had three children. Two of Clark's children, Clifford and Cheryl Stallworth, testified that they loved their father and hoped that he would not get the death penalty. Father Douglas Siebenaller, a Catholic priest, then testified that the imposition of the death penalty was against certain religious doctrine and that, based upon his conversations with Clark, Clark was filled with remorse over Manning's death. Finally, Clark made an unsworn statement on his own behalf.

After the sentencing hearing, the jury recommended a death sentence for Clark. The trial court accepted the jury's recommendation and sentenced Clark to death. The Ohio Court of Appeals affirmed Clark's conviction and sentence on direct appeal, *State v. Clark*, No. L-84-443, 1986 WL 15254 (Ohio Ct. App. Dec. 24, 1986), as did the Supreme Court of Ohio, *Clark,* 527 N.E.2d at 857. The Supreme Court of the United States denied certiorari. *Clark v. Ohio*, 489 U.S. 1071 (1989).

In 1989, Clark filed a state petition for post-conviction relief, which the trial court denied. In his state petition for post-conviction relief, Clark alleged that he was denied the effective assistance of counsel based on his counsel's failure to hire a neuropsychologist and pharmacologist to challenge the voluntariness of Clark's waiver of his rights against self-incrimination, and for failure to employ such experts during mitigation. In support of his claims, Clark offered the affidavits of Michael Gelbort, Ph.D., a licensed clinical psychologist, and Charles T. Kandiko, Ph.D., a doctor of pharmacology. Dr. Gelbort conducted a neuropsychological evaluation of Clark and concluded, in relevant part, that:

> The patient exhibits an Organic Brain Syndrome (OBS) at the time of testing. . . . [T]he condition was present at the time of the offense for which he has been convicted and was made worse as a result of the effects of the suicide attempt. It is likely that each of these problems contributed to the patient's neuropsychological dysfunction and that all were in effect and had an affect on his behavior at the time of his trial. Furthermore, his impaired cognitive abilities (caused by the OBS) would have caused him to be less able than a normal individual to comprehend the meaning of *Miranda* rights and be unable to weigh and deliberate his options in a normal fashion. This would have been the case at the time his confession was elicited in this case. As noted, the patient's deficits are especially prevalent when he [is] under stress, when affected by drug abuse (or withdrawal,) and in complex situations. This would have been the case at the time when the confession was elicited and would have further caused his confession to be other than freely given in a knowing fashion.

> Finally, the patient's behavior has not only been affected by the Organic Brain Syndrome/cognitive dysfunction from which he suffers, but also from the acute effects of substance abuse and eventual withdrawal. In particular, it is noted from the records that he was interrogated while withdrawing from psychoactive substances. Withdrawal is an emotionally and cognitively draining and debilitating experience during which cognitive abilities are further clouded or impaired from their operant state. [Patients] who are in withdrawal will often say or do whatever

they are asked to end a situation (questioning or interrogation) which is most often found to be exhausting, confusing, and may be experienced as physically nauseating. Information obtained from individuals in this state cannot be viewed as being as valid and accurate as that obtained form someone who is not under such duress and who may not acquiesce simply to end the interrogation.

While the hypoxia occurred after the criminal act, the data show that there were significant cognitive deficits which would have been caused by other etiologies and which would have been present at the time of the criminal act. It should also be noted that the patient's presentation is one where the lay person, and even a psychologist not trained in neuropsychology (or one who does not have the benefit of test data) could and likely would overlook the deficits . . . . Despite the neuropsychological deficits not having an overt, outwardly observable physical manifestation, they are real, readily observable in the test data, and the patient's history is clearly indicative of their presence. Review of the patient's history obviously signal[s] (and did signal at the time of the original trial) the presence of impaired functioning and should have [led] to neuropsychological testing and investigation at that time.

Dr. Kandiko conducted a neuropharmacological evaluation of Clark that addressed two specific areas: the opioid withdrawal syndrome that affected Clark at the time of his arrest and Clark's mental status during his interrogation by the police. Dr. Kandiko's affidavit gave the following analysis and conclusion:

8. [P]atients in opioid withdrawal have a tendency to be highly responsive to suggestion, and placebo effects are formidable . . . .

9. Mr. Clark, given his past history of opioid abuse (hydromorphone), was in my opinion suffering from opioid withdrawal at the time of his police interrogation. He had been in the hospital 6 days, but as the literature states a person in opioid withdrawal from a short-acting opioid will remain in severe withdrawal for as long as 10 days . . . . In addition, opioid abusers also experience prolonged withdrawal for as long as 6 months post detoxification . . . . Mr. Clark was interrogated without having any detoxification treatment. He would have been subject to all of the above physiological conditions with added anxiety and depression. A standard treatment for opioid abusers is to initially administer 20 mg methadone and adjust dosage as required . . . . Mr. Clark was never given the opportunity to undergo opioid treatment and detoxification.

10. A person suffering form opioid withdrawal is known to experience severe anxiety, restlessness, depression and discomfort . . . . [This is known as dysphoria.]

11. Since Mr. Clark was never treated medically for his opioid addiction, he was most probably in a state of opioid withdrawal at the time of his interrogation by police. This opioid withdrawal would include the mental dysphoria state, as well as the other stated physiological symptoms that are known to occur, when medical treatment is absent . . . . Therefore, it is my opinion, from a scientific viewpoint, that Mr. Clark was suffering from opioid withdrawal with the concomitant dysphoria during the police interrogation of him on January 23, 1984. This dysphoric state most probably had an adverse effect on Mr. Clark's ability to reason, adapt to changing topics, and in general tolerate a three hour interrogation.

The post-conviction trial court found that Clark's counsel was not deficient for failing to hire a neuropsychologist to challenge the ability of Clark to waive his rights against self-incrimination because "the uncontroverted facts firmly establish that a lawyer, untrained in neuropsychology, could not reasonably have been expected to have obtained neurological testing of petitioner." JA 330. In so finding, the trial court relied on the report of Dr. Gelbort, which stated that "It should . . . be noted that the patient's presentation is one where the lay person, and even a psychologist not trained in neuropsychology . . . could and likely would overlook the deficits."

The state post-conviction trial court also found that Clark could not demonstrate that he was prejudiced by his counsel's failure to call a neuropsychologist to challenge Clark's ability to waive his rights knowingly and voluntarily, because the trial court's decision not to suppress Clark's confession was "made independent of any psychological testimony, evidence, or rebuttal." Instead, the post-conviction court found the trial court's decision had been based "on petitioner's experience with criminal proceedings and his being repeatedly informed of his *Miranda* rights," as well as the fact that there was "no evidence that petitioner's will had been overborne by deprivation, mistreatment, threats, or inducements." *See* JA 330-331.

The state post-conviction trial court also rejected Clark's argument that trial counsel had been ineffective for failing to call a neuropsychologist during mitigation. The court explained that, "[a]t most, the additional expert testimony would have bolstered evidence that was already before the trial court concerning defendant's lack of mental acumen and drug addiction."

The post-conviction trial court also rejected Clark's claim that his counsel had been deficient for failing to call a pharmacologist to testify that Clark's opioid withdrawal adversely affected his ability to understand his rights and to make a reliable statement. The court held that expert evidence offered by Clark "simply does not allow reasonably for the conclusion that trial counsel, by failing to present [evidence of Clark's opioid withdrawal], so undermined the proper functioning of the adversarial process that the trial court would not have reliably produced a just result."

Finally, the court determined that Clark's counsel had not been ineffective for failing to introduce additional mitigating evidence, including the additional testimony of friends and relatives. As to Clark's failure to call a neuropsychologist during mitigation, the trial court had already ruled, as noted above, that Clark could not demonstrate that he was prejudiced by the failure to call a neuropsychologist. The trial court also ruled, as to other mitigating evidence, including the need for a pharmacologist, that Clark had not shown that the failure to introduce the additional mitigating evidence so undermined the proper functioning of the adversarial process that the trial could not have produced a just result.

The Ohio Court of Appeals affirmed the denial of the petition. *State v. Clark*, No. L-97-1151, 1998 WL 484119 (Ohio Ct. App. Aug 14, 1998). The appellate court held that the trial court correctly determined that Clark's counsel had not been deficient for failing to employ a neuropsychologist or pharmacologist to challenge Clark's ability knowingly and voluntarily to waive his rights against self-incrimination. *Id*. at *7. The appellate court noted that Clark's counsel had in fact engaged a psychiatrist to testify about Clark's impaired mental condition at the time of his confession. *Id.* Moreover, the appellate court noted that the trial court correctly concluded that Clark's counsel could not be deficient for failing to call a neuropsychologist when Clark's own expert stated that Clark's impairments "could and likely would" have been overlooked by a lay person or a psychologist not trained in neuropsychology. *Id.*

The appellate court also concluded that Clark had not been prejudiced as a result of his counsel's failure to call a neuropsychologist to challenge Clark's ability to waive his rights against self-incrimination knowingly and voluntarily. *Id.* The appellate court noted that police overreaching is necessary for a finding of involuntariness and that no police overreaching was

present in this case. *Id*. The court also noted that the defense had in fact presented testimony at the suppression hearing from a psychiatrist, Dr. Taney, concerning Clark's diminished mental capabilities and that, notwithstanding Dr. Taney's testimony, the trial court found that Clark had voluntarily waived his rights against self-incrimination. *Id*. at *7-*8.

The appellate court also held that the trial court correctly determined that Clark's counsel had not been ineffective for failing to employ a pharmacologist to testify to the effects of Clark's drug addiction and withdrawal on his ability to waive his rights against self-incrimination knowingly and voluntarily. *Id*. at *8. The appellate court stated that Clark "made no showing that defense counsel was incompetent in failing to call a pharmacologist." *Id*. The court then stated that, even assuming that Clark's counsel should have called a pharmacologist to discuss the effects of Clark's drug addiction and withdrawal on Clark's ability to waive his rights knowingly and voluntarily, Clark had failed to establish that he had been prejudiced by such a failure. *Id*. The appellate court noted that, despite Dr. Kandiko's testimony regarding the effects of drug withdrawal, there was testimony introduced at the suppression hearing that Clark did not appear to be suffering any negative effects as a result of drug withdrawal. *Id*. The appellate court noted that testimony established that, at the time of his confession, Clark "was lucid, seemed relaxed, and stated that he was not under the influence of drugs or alcohol." *Id*.

Finally, the appellate court held that Clark's counsel had not been ineffective for failing to introduce additional evidence at Clark's mitigation hearing, including testimony from a neuropsychologist about Clark's organic brain disorder, from a pharmacologist about Clark's drug addiction, and from various friends and family about Clark's traumatic childhood. *Id*. at *10. The appellate court held that Clark's counsel was not deficient for failing to present evidence of a neuropsychologist or pharmacologist at mitigation. *Id*. at *8. The appellate court also held independently that there was no showing of prejudice from the lack of such additional evidence because "[a]ppellant offered in mitigation, testimony regarding his mental state, drug addiction, and family history," and Dr. Gelbort's and Dr. Kandiko's testimony "would have been cumulative at best." *Id*. Accordingly, Clark had "failed to demonstrate that defense counsel's performance fell below an objective standard of reasonable representation or that [Clark's] defense was prejudiced from counsel's actions." *Id*.

With particular reference to mitigation, the court reproduced extensively the findings of the Supreme Court of Ohio on direct appeal regarding mitigation evidence. The Supreme Court of Ohio had referred specifically to Dr. Kisin's testimony regarding Clark's mental condition as it related to mitigation:

> Appellant also called Dr. Kisin, a psychologist, to testify about his discussions with appellant concerning the same period. Dr. Kisin also gave his opinion about appellant's state of mind during and after the murder and his prospects for rehabilitation.

*Id.* at *9. The post-conviction appellate court concluded that, "none of the proposed witnesses would add any information to that which had been provided to the jury" and that any additional evidence would have been "merely cumulative." *Id*. at *10. The appellate court accordingly denied Clark's petition for post-conviction relief, *id*. at *11, and the Supreme Court of Ohio declined further review, *State v. Clark*, 704 N.E.2d 577 (Ohio 1999).

In February of 2000, Clark filed a § 2254 petition for federal post-conviction relief, which the district court denied in its entirety. A certificate of appealability was then granted that encompasses the two issues raised presently on appeal: (1) whether Clark's counsel was ineffective for failing to obtain a neuropsychologist and pharmacologist to testify at Clark's suppression hearing and trial about Clark's ability to waive his rights against self-incrimination; and (2) whether Clark's

counsel was ineffective for failing to obtain and introduce evidence, at the mitigation hearing, of Clark's organic brain syndrome, drug addiction and withdrawal, and troubled childhood.[2] The district court found that the state court was reasonable when it determined that Clark had not demonstrated that his counsel was ineffective or that Clark was prejudiced by any of his counsel's alleged deficiencies. We affirm.

## II.  Analysis

Because Clark filed his petition for habeas relief after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), the provisions of that Act apply to this case. Pursuant to AEDPA, a federal court may not grant a writ of habeas corpus for any claim that was adjudicated on the merits in state court, unless the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Court] on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the decision of the Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision is an "unreasonable application" of clearly established Supreme Court precedent when the state-court decision correctly identifies the governing legal standard but applies that standard to the facts of the case before it in an objectively unreasonable manner. *Id.* at 409-10. An unreasonable application of federal law is different than an incorrect application of federal law, and a federal court may not issue a writ of habeas simply because the federal court concludes that the state court erroneously applied clearly established federal law. *Id.* at 411.

In this case, Clark alleges that he was denied the effective assistance of counsel. The test for evaluating claims of ineffective assistance of counsel was set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, to succeed on a claim of ineffective assistance of counsel, a petitioner must show (1) that his counsel's performance was deficient, and (2) that the deficiency prejudiced the defense. *Id.* at 687.

## A.  The Suppression Hearing and Trial

Clark alleges that his counsel was ineffective for failing to employ a neuropsychologist and a pharmacological expert to testify at his suppression hearing and trial about the effect of Clark's organic brain syndrome and drug addiction on his ability to waive his rights against self-incrimination voluntarily and knowingly. In essence, Clark argues that, had evidence of his organic brain syndrome and drug addiction and withdrawal been presented during the motion to suppress, the trial court would have found that Clark did not voluntarily and knowingly waive his rights against self-incrimination. In support of this argument, Clark offers the previously described affidavits of Michael M. Gelbort, Ph.D., a licensed clinical psychologist, and Charles T. Kandiko, Ph.D., a doctor of pharmacology. In short, Dr. Gelbort's and Dr. Kandiko's affidavits conclude that

---

[2] The certificate of appealability was granted on the following four grounds:  (1) whether Clark's counsel rendered ineffective assistance by not employing a neuropsychologist to provide an opinion on Clark's ability to waive his rights against self-incrimination knowingly and intelligently, and by not presenting such evidence at trial and the sentencing hearing; (2) whether Clark's counsel rendered ineffective assistance by not hiring a pharmacological expert to provide an opinion at the suppression hearing on the effect that Clark's opioid withdrawal had at the time of his police interrogation and an opinion on the effect of the same syndrome at the sentencing hearing; (3) whether Clark's counsel rendered ineffective assistance by not adequately investigating and presenting evidence in mitigation during the sentencing hearing; and (4) whether Clark's trial counsel rendered ineffective assistance of counsel during the guilt and penalty phases of the trial. The district court in granting the COA recognized that these issues are interrelated.

Clark's drug addiction and brain syndrome would have caused Clark not to understand fully his rights and to be more susceptible to pressure from others.

After considering the affidavits of both Dr. Gelbort and Dr. Kandiko, the state trial court determined that Clark's counsel was not deficient for failing to call either a neuropsychologist or a pharmacologist. As to counsel's failure to call a neuropsychologist, the court found that "the uncontroverted facts firmly establish that a lawyer, untrained in neuropsychology, could not reasonably have been expected to have obtained neurological testing" based on Dr. Gelbort's conclusion that Clark's condition "is one where the lay person, and even a psychologist not trained in psychology . . . could and likely would overlook the deficits." The state trial court also found that Clark was not prejudiced by the failure to call a neuropsychologist or a pharmacologist to challenge Clark's ability to waive his rights against self-incrimination. In so finding, the trial court noted that "it is clear that the decision [to deny suppression of Clark's confession] was made independent of any psychological testimony, evidence, or rebuttal; rather, the trial court determined that petitioner's confession was voluntarily based on petitioner's experience with criminal proceedings and his being repeatedly informed of his *Miranda* rights in the instant case." The trial court also noted that there was "no evidence that petitioner's will had been overborne by deprivation, mistreatment, threats, or inducements." Finally, the trial court stated that Dr. Kandiko's affidavit "simply does not allow reasonably for the conclusion that trial counsel, by failing to present such evidence, so undermined the proper functioning of the adversarial process that the trial court would not have reliably produced a just result."

On appeal, the Ohio Court of Appeals, the highest state court to consider Clark's post-conviction claims, determined that Clark's counsel's failure to introduce evidence from a neuropsychologist and pharmacologist at the suppression hearing and trial did not fall below objective standards of reasonableness. *Clark*, 1998 WL 484119, at *7-*8. In regard to counsel's failure to hire a neuropsychologist, the appellate court noted that "[c]ounsel did engage a psychiatrist to testify in appellant's behalf concerning his mental condition at the time of his confession." *Id*. at *7. The court also noted that "appellant's own neuropsychologist, Dr. Gelbort, stated that it would have been difficult for a lay person to recognize appellant's deficits." *Id*. at *7. The appellate court also found that Clark had "made no showing that defense counsel was incompetent in failing to call a pharmacologist." *Id*. at *8.

The appellate court also determined that Clark had not demonstrated that he was prejudiced by his counsel's failure to introduce testimony from a neuropsychologist or pharmacologist at Clark's suppression hearing and trial. *Id*. at *7-*8. In so finding, the state court noted that police overreaching is necessary for a confession to be found involuntary, and that, since there was no evidence of police overreaching in this case, Clark could not demonstrate that the lack of testimony about his organic brain disorder or drug addiction would have changed the outcome of his suppression hearing or trial. *Id*. at *7. Moreover, the state court noted, "the trial court heard testimony from a psychiatrist concerning appellant's diminished mental capabilities [but] . . . [n]evertheless . . . concluded that appellant's statements to the police were voluntarily made." *Id*.

The district court properly found that the state court's determination was neither contrary to nor an unreasonable application of established Supreme Court precedent. Clark's counsel hired a psychiatrist, Dr. Taney, to testify at the suppression hearing about Clark's mental status at the time of his confession. Although Dr. Taney did not personally examine Clark, Dr. Taney did review Clark's medical records from the hospitalization following his suicide attempt, as well as Clark's juvenile records, various police documents, and the court's diagnostic and treatment reports. From a review of these records, Dr. Taney testified that, as a result of Clark's suicide attempt, Clark suffered from brain damage and chronic impairment of his mental functioning at the time of his confession. Dr. Taney testified that this impairment would have interfered with Clark's ability to make informed choices and to withstand pressure or duress. Furthermore, with respect to the need

for testimony from a neuropsychologist, Clark's own expert indicated that Clark's cognitive deficits would not be apparent to a lay person or even to a trained psychologist, and thus counsel cannot be found deficient for failing to hire such an expert.

Our case law supports the reasonableness of the Ohio appellate court's decision that counsel was not ineffective in this regard. We held in *Johnson v. Bell*, 344 F.3d 567, 573-74 (6th Cir. 2003), that counsel was not ineffective for failing to conduct further investigation where there was "nothing to suggest that counsel in the instant case ignored known leads that might have helped them to prepare their case in mitigation." In *Campbell v. Coyle*, 260 F.3d 531, 546-56 (6th Cir. 2001), we held that counsel's failure to investigate and discover petitioner's PTSD (post-traumatic stress disorder) was not ineffective assistance of counsel when a clinical psychologist failed to diagnose the petitioner as suffering from PTSD and when counsel investigated the petitioner's history. *See also Pruett v. Thompson*, 996 F.2d 1560, 1574 (4th Cir. 1993) (holding that an attorney was not ineffective for failing to discover that his client suffered from mental illness, organic brain damage, developmental problems, and post-traumatic stress disorder when a mental health expert examined the defendant and found that he did not suffer from such problems).

The state court was also reasonable in determining that Clark had failed to demonstrate prejudice as a result of his counsel's failure to introduce evidence from a neuropsychologist or pharmacologist at his suppression hearing or at trial. Clark's defense team introduced evidence at Clark's suppression hearing from a psychiatrist who concluded that Clark was suffering from depression, suicidal tendencies, and brain impairments that would have made Clark less able to understand his choices and to resist pressure from other individuals. It thus was reasonable for the state court to conclude that new information sought to be introduced by Clark about his drug addiction and brain disorder did not differ in a substantial way from the evidence actually presented at the suppression hearing and, accordingly, that Clark could not demonstrate that he was prejudiced by his counsel's failure to present such evidence.

Furthermore, the state court correctly noted that police overreaching is necessary for a confession to be found invalid under the Due Process Clause of the Fourteenth Amendment. *See Colorado v. Connelly*, 479 U.S. 157, 164 (1986). In *Connelly*, the defendant had approached a police officer and insisted on confessing to a murder committed a year earlier. The defendant was later diagnosed as suffering from a psychosis that interfered with his ability to make free and rational choices. The Supreme Court held that the defendant's impaired mental status was not a sufficient basis for which to find that the defendant's confession was involuntary. Rather, the court held, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167. As our court has explained, "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989). Clark has not demonstrated that there was police overreaching in this case. Accordingly, even if we assume that testimony about his organic brain syndrome and drug addiction should have been introduced at the suppression hearing, there is no merit to Clark's argument that his confession was involuntary or unconstitutionally admitted. Accordingly, the state court was reasonable in concluding that Clark was not prejudiced by his counsel's failure to introduce evidence from a neuropsychologist and/or pharmacologist at Clark's suppression hearing and trial.

In addition, Clark has not demonstrated that evidence of organic brain syndrome would have established that Clark's confession was unknowing and unintelligent. Unlike claims brought solely under the Due Process Clause of the Fourteenth Amendment, claims regarding *Miranda* waivers must demonstrate not only that the confession was voluntary but also that the confession was knowing and intelligent. *See Colorado v. Spring*, 479 U.S. 564, 573 (1987). To determine whether

the confession was knowing and intelligent, we apply a totality of the circumstances test to ascertain whether Clark understood his right to remain silent and to await counsel. The inquiry is not whether "a criminal suspect know[s] and understand[s] every possible consequence of a waiver of the Fifth Amendment privilege." *Id.* at 574. The totality of the circumstances in this case demonstrates that Clark waived his rights knowingly and intelligently.

That Clark had borderline retardation (in the words of Dr. Kisin) or "low average intellect" (in the words of Dr. Gelbort) is not dispositive. Our sister circuits have found several instances where defendants, despite their mental retardation or low I.Q.'s, were found to have waived their rights knowingly and intelligently. *See, e.g.*, *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998) (holding that defendant's borderline I.Q. did not prevent knowing and intelligent waiver); *Rice v. Cooper*, 148 F.3d 747, 751 (7th Cir. 1998) (holding that mildly retarded defendant gave valid waiver because police had no reason to suspect that he did not understand the warnings); *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995) (determining that, despite defendant's I.Q. of only 78, he gave a valid waiver because he received warnings several times both while in custody and for prior crimes). According to the Supreme Court of Ohio, Clark stated that he was not intoxicated when he gave his confession, read his *Miranda* warnings aloud, affirmed his understanding after reading each paragraph, signed the waiver form, and was offered the chance to make any corrections to his tape-recorded statement. The Ohio Court of Appeals found that he was warned "in excess of nine times" during the investigation. Clark does not challenge these findings of the state courts or argue that these facts fail to evidence a knowing waiver. Under the totality of the circumstances, the state courts' finding that Clark's waiver was knowing and intelligent was not unreasonable, even assuming that he suffered from organic brain syndrome.

## B. The Mitigation Hearing

Clark's argument that his counsel was ineffective at the sentencing phase of his trial also fails. Clark argues that his counsel was ineffective for failing to introduce expert evidence about Clark's organic brain syndrome, drug addiction and withdrawal, and troubled childhood. In support of this argument, Clark offers the reports and affidavits from Dr. Gelbort and Dr. Kandiko, as well as affidavits from various family members. The family-member affidavits describe Clark's father as an alcoholic womanizer, provide more unseemly details about Clark's father's death, note that Clark had discipline problems after his father's death, and state that Clark frequently got into trouble and spent time in jail. The state court determined that Clark's counsel was not ineffective for failing to call these additional witnesses because it found that the newly offered evidence was "merely cumulative" to that which had been presented at the mitigation hearing. The district court properly concluded that the state court's decision was not unreasonable or contrary to Supreme Court precedent.

A counsel's failure to make a reasonable investigation of a defendant's psychiatric history and family background, and to present mitigating evidence to the jury at sentencing, can constitute ineffective assistance. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). In assessing whether a defendant's counsel was ineffective at the mitigation hearing for failing to introduce certain evidence, the focus must be on whether the investigation supporting counsel's decision not to introduce mitigating evidence of the defendant's background was itself reasonable. *Id.* at 523. In assessing the reasonableness of an attorney's investigation, the quantum of evidence known to counsel must be considered, as well as whether that evidence should have led a reasonable attorney to investigate further. *Id.* at 527.

The state trial court determined that Clark's counsel was not deficient for failing to introduce evidence at the mitigation hearing from a neuropsychologist, a pharmacologist, and from various other witnesses. With regard to the lack of testimony from a neuropsychologist, the trial court found that "[a]t most, the additional expert testimony would have bolstered evidence that was already

before the trial court concerning defendant's lack of mental acumen and drug addiction." With regard to counsel's failure to interview additional friends, relatives, and professional people in regard to Clark's history, the trial court found the evidence was "more of the same type of evidence" that had already been considered.

On appeal, the Ohio appellate court agreed that Clark's counsel was not ineffective at the mitigation hearing for failing to call a neuropsychologist, a pharmacologist, and various family members. *Clark*, 1998 WL 484119, at *8, *10-*11. The court first found that Clark "failed to establish that counsel was deficient in not presenting . . . evidence [from a neuropsychologist and pharmacologist]." *Id*. at *8. The appellate court then noted that Clark "offered in mitigation . . . testimony regarding his mental state, drug addiction, and family history." *Id*. at *8. The appellate court therefore found "[u]pon a review of the affidavits [from Dr. Gelbort, Dr. Kandiko, and Clark's various family members,] . . . that none of the proposed witnesses would add any information to that which had been presented to the jury." *Id*. at *10. Thus, the court held that "even assuming that counsel should have attempted to obtain this additional evidence, because it was merely cumulative, appellant failed to demonstrate any resultant prejudice." *Id*. at *10.

The state court's holding that Clark's counsel was not deficient for failing to call a neuropsychologist, a pharmacologist, and more members of Clark's family to testify about his background was not unreasonable or contrary to Supreme Court precedent. It is clear that the defense did investigate and present evidence regarding Clark's mental health, drug abuse, and family background at the mitigation hearing. Although Clark asserts that counsel should have employed a pharmacological expert, the psychological expert that counsel did employ, Dr. Kisin, addressed Clark's drug addiction and its effect on his criminal conduct. As to the necessity of employing a neuropsychologist, it was not unreasonable for the state court to determine that Clark's counsel was not deficient for failing to recognize the need for such an expert, since Dr. Gelbort's own report admitted that Clark's deficits generally would not be recognizable to a lay person, or even to a psychologist.[3] Moreover, it does not appear that either the psychologist or psychiatrist retained by the defense to evaluate Clark suggested that Clark suffered from organic brain damage or that Clark required any additional mental health testing.[4] It was not unreasonable for Clark's counsel, untrained in the field of mental health, to rely on the opinions of these professionals.[5] This conclusion is supported by this court's decision in *Campbell*, 260 F.3d at 555-56. In *Campbell*, a defendant seeking habeas relief alleged that his counsel was ineffective for failing to suspect that he may have "suffered from [post-traumatic stress disorder] based on the facts and circumstances of his case." *Id*. at 555. This court rejected the defendant's argument, relying heavily on the fact that counsel had the defendant examined by a trained psychologist who failed to detect evidence of the defendant's possible mental disorder. *Id.* at 555-56. The court noted that there was "no

---

[3] Dr. Gelbort's report goes on to state that Clark's impaired functioning should have led to additional testing, but the report fails to explain how the need for additional testing could have been apparent when Clark's deficiencies "could and likely would [have been] overlook[ed]."

[4] Although Dr. Taney testified that Clark suffered from brain damage as a result of his suicide attempt, Dr. Taney did not opine that Clark suffered from congenital, or organic, brain problems. Furthermore, Dr. Taney did not indicate that any further neurological testing was needed. Under such circumstances, Dr. Taney's testimony that Clark suffered brain damage subsequent to the crime could not have served as a "red flag" to put Clark's counsel on notice that Clark may have suffered from congenital brain defects.

[5] The fact that Clark's counsel retained psychological and psychiatric experts to aid in Clark's defense demonstrates that Clark's counsel complied with American Bar Association Guidelines requiring counsel to perform an investigation into a defendant's mental health status and not to rely merely on their own observations to detect any possible mental heath conditions from which the defendant may be suffering. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 4.1 Commentary (rev. ed. 2003), *reprinted in* 31 Hofstra L. Rev. 913, 956-57 (2003).

evidence that [the trained psychologist] was incompetent, or that [counsel] had any reason to question [the expert's] professional qualifications." *Id.* at 555. Thus, the court found that "it was objectively reasonable for . . . counsel to rely upon [the trained psychologist's] diagnosis and . . . trial counsel's failure to independently diagnose PTDS was not unreasonable." *Id.*

The Fourth Circuit reached a similar conclusion in *Pruett*, 996 F.2d 1560. In *Pruett,* a petitioner alleged that he was entitled to post-conviction relief because his attorney was ineffective for failing to investigate or present mitigating evidence of mental illness, developmental problems, organic brain damage, and post-traumatic stress disorder. *Id.* at 1573. In rejecting the petitioner's argument, the Fourth Circuit noted that counsel had in fact consulted with a psychiatrist, who concluded that Pruett did not suffer from any of the alleged mental illnesses or abnormalities. *Id.* at 1573-74. The court stated that, under such circumstances, counsel was not ineffective for failing to discover the mental defect. *Id.* at 1574. The court went on to explain that "[a]n attorney is not required to be so expert in psychiatry." *Id. See also Easley v. Dretke,* No. 03-41495, 2005 WL 352673, at *3-*5 (5th Cir. Feb. 15, 2005) (holding that counsel was not ineffective for failing to discover and present evidence that the defendant suffered from post-traumatic stress disorder because counsel "had investigated the defendant's history and had no reason to suspect the existence of PTSD"). In this case, Clark was examined by a psychiatrist and a psychologist. Neither expert concluded that Clark suffered from organic brain damage, nor did either suggest that Clark needed further neurological testing. Under such circumstances, Clark's counsel was not ineffective for failing independently to discover the need for additional neurological testing.

Finally, as to the additional evidence concerning Clark's family history, it is clear that evidence of Clark's background was introduced by Dr. Kisin and by Clark's mother. Our cases reject a requirement that any later-identified cumulative mitigating evidence must have been introduced in order for counsel to be effective. As this court recently explained, "to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005). This court also held in *Smith v. Mitchell*, 348 F.3d 177, 200-02 (6th Cir. 2003), that a petitioner was not prejudiced by his counsel's failure to introduce additional mitigating evidence at sentencing where new evidence sought to be introduced was merely cumulative to that which had already been presented at mitigation.[6]

The state court's determination that Clark did not suffer any prejudice as a result of his counsel's allegedly deficient performance was also a reasonable application of federal law and provides an independent basis for affirmance. While the opinions of Dr. Gelbort and Dr. Kandiko, as well as the affidavits from Clark's family, provide further mitigating details about Clark, they do not significantly expand upon the information that was available to the jury. Dr. Kisin and Clark's mother testified about the death of Clark's father and the effect it had on Clark's childhood. Dr. Kisin also addressed Clark's drug addiction and its effect on Clark's criminal activity, although not to the extent set forth in Dr. Kandiko's affidavit. Also, while Dr. Kisin did not diagnose Clark as suffering from an organic brain syndrome, Dr. Kisin did testify about Clark's borderline intelligence level and his dull affect. He also testified at length about Clark's drug use and its effects. The fact

---

[6]Moreover, the transcript from the mitigation hearing strongly suggests that counsel made a strategic decision to limit testimony about Clark's past in order to prevent "opening-the-door" to evidence of Clark's criminal background. Defense counsel vigorously objected to attempts by the prosecutor to delve into the facts concerning Clark's criminal history. As noted in *Strickland*, 466 U.S. at 690-91, a strategic decision to pursue or not to pursue a particular trial tactic "after thorough investigation of law and facts," is "virtually unchallengeable." *Cf. Truesdale v. Moore*, 142 F.3d 749, 754-55 (4th Cir. 1998) (holding that counsel was not ineffective for failing to present evidence of defendant's organic brain disorder as part of a strategic decision not to present mitigating evidence that would fail to portray the defendant as a normal individual capable of rehabilitation). The likelihood that Clark's counsel made a strategic decision not to limit evidence of Clark's past so as to prevent "opening-the-door" to his past convictions supports the reasonableness of the Ohio Court of Appeals' determination regarding the performance of defense counsel.

that Dr. Kisin's precise characterization of Clark's mental health deficiencies was presented in one sentence—that Clark "at best, operates on a dull normal level of intelligence and at worst in a borderline retarded way"—does not diminish the overall impact of the psychologist's mitigation testimony, the direct portion of which covered approximately twenty pages of transcript. Dr. Kisin's testimony virtually coincides with Dr. Gelbort's conclusion that Clark "has undergone neuropsychological evaluation and demonstrates low average intellect." While Dr. Gelbort's affidavit also states that Clark suffers from a cognitive dysfunction that causes him to have difficulty with cognitively complex tasks, it is reasonable to conclude that an individual functioning at a "dull normal" or "borderline retarded" level would also have difficulty comprehending complex tasks. Thus, while Dr. Kisin did not specifically state the *cause* of Clark's mental deficiencies, Dr. Kisin's testimony that Clark operated at a "dull normal" or "borderline retarded" level described the *effects* of Clark's mental deficiencies. Under such circumstances, we cannot say that the state court's decision that such evidence would have been "merely cumulative" is objectively unreasonable. *See Williams*, 529 U.S. at 413.

In cases such as *Hill*, 400 F.3d 308 (6th Cir. 2005), and *Smith v. Mitchell*, 348 F.3d 177 (6th Cir. 2003), this court has reached similar conclusions. In *Hill*, this court held that a defendant was not prejudiced by his counsel's retention of a psychologist, Dr. Friedman, one day before the mitigation hearing because "the mitigation theory that the psychologist did present . . . did not differ in material ways" from the new evidence that the defendant sought to introduce. 400 F.3d at 311. Dr. Friedman testified at Hill's mitigation hearing that Hill was addicted to cocaine, that intoxication affected Hill's actions at the time of the murder, and that many crack addicts who consume large amounts of cocaine may enter a mental state called cocaine psychosis in which they become irrational, violent, and aggressive. *Id*. at 312. In his petition for post-conviction relief, Hill presented the affidavits of Dr. Julia Hawgood, a psychiatrist, and Dr. Gary Sales, a psychologist, to demonstrate how a properly prepared expert could have (and should have) testified. *Id*. at 316. This court, however, determined that Hill could not establish prejudice because the affidavits of Dr. Sales and Dr. Hawgood were not materially different from the testimony introduced by Dr. Friedman. *Id*. at 317-18. The court reached this conclusion despite the fact that Dr. Friedman's testimony was "more abbreviated" than Dr. Sales' and that Dr. Hawgood's affidavit provided "more information" than what had been presented by Dr. Friedman. *Id*. at 317.

This case is similar in many ways to *Smith v. Mitchell*, 348 F.3d 177 (6th Cir. 2003), in which we rejected a claim similar to Clark's. In *Smith* a clinical psychologist, Dr. Schmidtgoessling, had testified at mitigation regarding Smith's developmental history, his extensive history of substance abuse, and his "low average to borderline range of intellectual functioning." *Id*. at 192. In support of his application for post-conviction relief, Smith offered the affidavits of three mental health experts as evidence of Smith's disadvantaged childhood, of his borderline retarded range I.Q., and that he suffered from a diffuse organic brain impairment that was present at the time of the crime. *Id*. at 196-98. Unsuccessful in state post-conviction proceedings and in the federal district court on habeas, Smith appealed to this court. This court rejected a claim that Smith's counsel had been ineffective for failing to produce additional mitigating evidence. We rejected Smith's claim because not presenting the additional evidence was neither ineffective nor prejudicial under *Strickland*—all of this evidence *had been* presented at mitigation. *Id*. at 200. We explained that "the only allegedly new mitigating evidence that Smith presents is that he suffers from organic brain damage." *Id*. at 201. The post-trial evidence, however, boiled down to testimony that Smith had "*mild* diffuse cerebral dysfunction." *Id.* at 202. Similarly, in the case at bar the evidence from Dr. Gelbort was limited to a brief statement that Clark "exhibits an Organic Brain Syndrome (OBS) *at the time of testing*" (emphasis added), accompanied by the opinion that the condition "likely was congenital and exacerbated by" events occurring after the crime. While the Gelbort report focuses primarily on Clark's deteriorated mental health at the time of the confession and at the time of trial, the report does state conclusorily at two points that "the patient's behavior has . . . been affected by the Organic Brain Syndrome/cognitive dysfunction" and "the data show that there were significant

cognitive deficits which would have been caused by other etiologies [than hypoxia] and which would have been present at the time of the criminal act." As in *Smith*, "that evidence is not compelling . . . because it is not conclusive." 348 F.3d at 201-02. Also as in *Smith*, the evidence is not sufficient to support the related argument that the evidence showed that Clark's trial counsel should have obtained a neurological examination. The Gelbort report, after all, stated specifically that "even a psychologist not trained in neuropsychology . . . could and likely would overlook the deficits." The *Smith* case thus lends further support to our conclusion that the reasoning of the Ohio Court of Appeals did not unreasonably apply Supreme Court precedent in rejecting Clark's ineffective assistance of counsel claim.

The Supreme Court's recent decision in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), does not require a different result. In *Rompilla*, the Supreme Court granted the petitioner's motion for habeas relief after finding the petitioner's counsel ineffective for failing to find mitigating evidence. In particular, the Supreme Court held that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." *Id.* at 2460. The holding of *Rompilla*, however, simply does not apply to the present case. In *Rompilla*, the Court found Rompilla's counsel ineffective for failing to review a file containing information about Rompilla's past convictions, which the defense knew the prosecutor intended to rely upon at trial. The Supreme Court found one point to be "clear and dispositive: the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction." *Id.* at 2463. Numerous times throughout the *Rompilla* opinion, the Court noted that its holding is based on the "notion that defense counsel must obtain [available] information that the State has and will use against the defendant." *Id.* at 2465. In this case, there was nothing so obvious as the prosecutor's intended use of the file at issue in *Rompilla* to put Clark's defense counsel on notice that there was additional mitigating evidence to be reviewed or discovered.

Furthermore, the presence of prejudice from the lawyer's failure to review the file in *Rompilla* was so overwhelming that the state did not even contest prejudice. *Id.* at 2468-69. The evidence of Clark's organic brain disorder is not even close in scope or nature to what new mitigating evidence counsel in *Rompilla* would have discovered had they explored leads found in the file containing information about Rompilla's prior convictions. In *Rompilla*, defense counsel failed to discover not only evidence that Rompilla suffered from an organic brain disorder, but also evidence that Rompilla was the child of severe alcoholics, that Rompilla had frequently witnessed his father beating his mother, that on one occasion Rompilla's mother stabbed his father, that Rompilla was beaten when he was young, that Rompilla's father locked him in a small wire mesh dog pen filled with excrement, that Rompilla was raised in a house with no heat or plumbing, and that Rompilla attended school in rags. While Clark also suffered from a disadvantaged childhood, evidence of Clark's traumatic childhood was introduced at the mitigation stage of his hearing, unlike in *Rompilla*. The failure of Rompilla's counsel to discover an abundance of additional mitigating evidence relating to Rompilla's childhood, in addition to Rompilla's organic brain disorder, makes *Rompilla* clearly distinguishable from the present case.

Finally, our court's recent decision in *Harries v. Bell*, Nos. 02-6286, 02-6334, 2005 WL 1796224 (6th Cir. July 28, 2005), is also distinguishable. In *Harries* we affirmed the grant of habeas corpus on the basis of ineffective assistance of counsel at the mitigation stage, where

> Counsel limited their investigation to contacting by telephone Harries's mother and brother, sending requests for information to some of the institutions in which Harries had been confined, and interviewing Harries, Harries's co-defendant, and two state witnesses. Although counsel requested two court-ordered competency evaluations, they declined to seek the assistance of a mental health expert or conduct a thorough

> investigation of Harries's mental health, even after Harries's mother alerted them
> that Harries suffered from mental illness. Nor did counsel adequately investigate
> Harries's family background, despite indications of Harries's troubled childhood.

*Id.* at *5. This contrasts starkly with the efforts of Clark's counsel, who elicited testimony of a mental health expert, including extensive testimony regarding Clark's troubled childhood. In *Harries* the showing of prejudice was also far stronger than in Clark's case. Evidence that Harries's counsel did not put before the jury included not only damage to the frontal lobe of Harries's brain resulting from childhood blows, but also extensive evidence of his traumatic childhood, including the significant physical abuse Harries suffered at the hands of his mother, stepfather, and grandmother, and exposure to remarkable family violence. *Id.* at *6. The scope and depth of the never-presented mitigation evidence in *Harries* was extraordinary; in Clark's case it was minimal.

## III.  Conclusion

The state court was reasonable in determining that counsel's representation was not deficient at Clark's suppression hearing, trial, or mitigation hearing. The state court was also reasonable in determining that Clark failed to demonstrate that he suffered prejudice as a result of his counsel's alleged deficiencies at any stage of the proceedings. We accordingly AFFIRM the district court's judgment denying Clark's petition for a writ of habeas corpus.

———————————

**DISSENT**

———————————

MERRITT, Circuit Judge, dissenting.  Clark's post-conviction counsel in this case has developed extensive evidence of congenital organic brain damage and has shown that effective trial counsel would have investigated and developed such evidence for submission to the jury at the mitigation phase of the case.  Such evidence would have given Clark's counsel a good basis for arguing in favor of reduced culpability.  Despite having notice that Clark suffered from brain damage, his trial counsel failed to have him examined by an expert with training in neuropsychology and failed to present any evidence of this congenital brain defect to the sentencing jury.  Exactly the same basic pattern occurred in *Rompilla v. Beard*, 125 S.Ct. 2456 (Jun. 20, 2005), in which the Supreme Court held that a failure to investigate and consequential failure to develop evidence of organic brain damage constituted ineffective assistance of counsel under the Sixth Amendment.  The Ohio court's decision and our Court's decision are irreconcilable with *Rompilla* and other Supreme Court precedent concerning the duty of counsel to investigate mitigating evidence in capital cases.

Clark's primary contention concerning the sentencing phase of his trial is that trial counsel was constitutionally ineffective in its failure to investigate and present evidence of Clark's organic brain damage.  In support of this claim, Clark included in his habeas petition an affidavit and report by a neuropsychologist.  Dr. Michael Gelbort examined Clark in June of 1996.  Dr. Gelbort found that "[t]he patient exhibits an Organic Brain Syndrome (OBS)."  Gelbort concluded that the condition was likely congenital and exacerbated by drug abuse and the "asphyxia/hypoxic event or brain injury" that occurred when Clark attempted suicide.  Gelbort additionally found that the condition was present at the time of the criminal act and that this congenital condition significantly contributed to Clark's neuropsychological dysfunction.

The state courts found that the failure to investigate Clark's neurological deficiencies and present evidence similar to that contained in Dr. Gelbort's report failed to satisfy either the deficiency or the prejudice prong of *Strickland*.  The District Court denied Clark's habeas petition on this ground finding the Ohio courts' reasoning persuasive.  This Court could affirm the District Court's decision only by giving short shrift to the record and ignoring the clear impact of important recent Supreme Court opinions concerning the duty of an attorney in a capital case to fully investigate evidence in mitigation. *See Rompilla*, 125 S.Ct. at 2462; *Wiggins v. Smith*, 539 U.S. 510 (2003).  Even when applying the deferential standard mandated by 28 U.S.C. 2254(d)(1), the Ohio state courts treatment of Clark's Sixth Amendment claim involved an unreasonable application of clearly established Federal law as determined by the Supreme Court. *See Williams v. Taylor*, 529 U.S. 362, 413 (2000).

A.  Deficiency

Both the state post-conviction trial court and the Ohio Court of Appeals found that Clark's counsel was not deficient in its failure to further investigate Clark's brain damage. *State v. Clark*, 1998 WL 484119 at \*6-\*8 (Ohio Ct. App. 1998).  The only stated reason to support this conclusion, a reason reported by our Court, was the fact that his medical condition was not apparent to those untrained in neuropsychology. *Id.*  Both courts point to a statement in Dr. Gelbort's report that *seems* to support their view: "It should . . . be noted that the patient's presentation is one where the lay person, and even a psychologist not trained in neuropsychology . . . could and likely would overlook the deficits." *Id.* at \*6, \*7.  Drawing on that statement, the courts suggest that Clark's attorneys could not have been deficient in failing to investigate a condition that was undetectable by a lay lawyer.

Yet, this finding on deficiency is patently unreasonable. First, the courts misread Dr. Gelbort's report concerning whether there should have been further investigation of Clark's mental deficiencies. While Dr. Gelbort's report does indicate that Clark's brain damage was not readily apparent to the untrained eye, it goes on to highlight that Clark's patient history and test data clearly demonstrated deficiencies and indicated the need for neuropsychological testing.[1] Below is Dr. Gelbort's statement in its proper context. The language ignored by the state courts and our court is underlined:

> It should also be noted that the patient's presentation is one where the lay person, and even a psychologist not trained in neuropsychology (or one who does not have the benefit of the test data) could and likely would overlook the deficits. The analogous situation in physical medicine would be the inability of a layperson, or even a physician, to diagnose a cancer from simple external observation and without the benefit of radiological test data. *Despite the neuropsychological deficits not having an overt, outwardly observable physical manifestation, they are real, readily observable in the test data, and the patient's history is clearly indicative of their presence. Review of the patient's history obviously signal (and did signal at the time of the original trial) the presence of impaired functioning and should have lead to neuropsychological testing and investigation at that time.*

J.A. 269.

More importantly, Clark's counsel had notice that Clark had suffered brain damage and still failed to conduct further investigation. An expert witness in a pre-trial hearing described Clark as suffering from both chronic and acute brain damage.[2] The state court's rationale that the deficiencies were not overt is simply nonsensical in light of the fact that the counsel knew (or should have known) of Clark's condition. Yet, Clark's counsel failed to either investigate this neuropsychological condition or present evidence concerning it during the mitigation phase.

One of the essential questions in this type of ineffective assistance of counsel case is: How strong is the lead or the prompting evidence? Should the lead cause trial counsel to investigate organic brain damage that may seriously affect a juror's view of the defendant's culpability? With regard to counsel deficiency, the instant case is significantly stronger than the *Rompilla* case.

In *Rompilla*, the Supreme Court held that a Pennsylvania petitioner's trial counsel was deficient in its failure to discover mitigating evidence, including evidence that Rompilla suffered from organic brain damage. 125 S.Ct. at 2464-69. Rompilla's counsel, while on notice that the Commonwealth would attempt to prove the defendant's history of violence by introducing his prior conviction for rape and assault, failed to examine the record of that conviction. *Id.* at 2464. The Court further highlighted that "[i]f the defense lawyers had looked in the file on Rompilla's prior

---

[1] The guidelines for capital defense work promulgated by the American Bar Association (ABA) undermine the Ohio courts' suggestion that the difficulty of diagnosis would be a basis for failing to investigate neurological deficiencies: "Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions . . . that could be of critical importance." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 4.1 Commentary (rev. ed. 2003), *reprinted in* 31 Hofstra L. Rev. 913, 956-57 (2003).

[2] Prior to the trial, Clark challenged the admissibility of his confession on the grounds that he was incapable of voluntarily, intelligently, and knowingly confessing to the crime. During a pre-trial hearing, Clark's counsel introduced the testimony of Dr. Emanuel Tanay, a psychiatrist. While Dr. Tanay did not examine Clark personally, he did review his medical records. Based on this investigation, Dr. Tanay testified that Clark had significant brain damage. As the trial court summarized: "Essentially, Dr. Tanay concluded that there was a reasonable medical certainty that Clark suffered both acute and chronic brain damage . . . ." J.A. 273.

conviction, it is uncontested they would have found a range of mitigation leads that no other source had opened up." *Id.* at 2468. Importantly, while the defense lawyers interviewed Rompilla and members of his family and consulted with three different mental health workers, they did not discover any evidence of mental deficiency for use during the sentencing phase. *Id.* at 2462-63. Yet when the post-conviction attorneys examined Rompilla's prison records, they "found plenty of 'red flags' pointing up a need to test further." Following these leads would have brought important mitigating evidence to light:

> When they tested, they found that Rompilla "suffers from organic brain damage, *an extreme mental disturbance significantly impairing several of his cognitive functions*." . . . "Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense."

125 S.Ct. at 2469 (emphasis added).

Contrary to our Court's conclusory opinion that "*Rompilla* simply does not apply to the present case," Clark's case is much stronger than *Rompilla*, where it took many more steps to get from the lead to the final medical diagnosis of brain damage. The *Rompilla* lawyers were deficient for failing to examine the record of a prior criminal proceeding which had attached to the prior conviction some later imprisonment records. These imprisonment records would have alerted them to the need for further medical testing, which would have revealed organic brain damage. The imprisonment examination did not itself show organic brain damage. In *Rompilla*, the lead would have required the reading of a prior criminal proceeding and then some old prison records in the same file and then make an inference of brain damage leading to further testing. The dissent in *Rompilla* points out the multiple steps counsel would have had to take to get to the finding of brain damage. Here, Clark's counsel would not have been required to dig through an old transcript or look for tell-tale signs that further testing was needed. Instead, trial counsel merely needed to investigate further a known neurological defect, a defect about which Clark's pre-trial hearing expert witness had already testified. This failure to follow this important lead and failure to investigate this obvious source of mitigating evidence falls far below the level of reasonable performance.

Investigating a known mental defect "is not simply a matter of common sense." *Rompilla*, 125 S.Ct. at 2465. In *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), the Supreme Court embraced the standards for capital defense work promulgated by the American Bar Association (ABA) as a relevant standard by which to judge the reasonableness of counsel's performance.[3] The 1989 ABA guidelines direct counsel in capital cases to "collect information relevant to the sentencing phase of trial including, but not limited to: medical history (mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays); educational history (achievement, performance and behavior) special educational needs (including cognitive limitations and learning disabilities) . . . ." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases

---

[3]In *Wiggins*, the Court found that habeas should issue where the petitioner's trial counsel did not adequately investigate his client's life history. Rather than conducting an investigation, the counsel in *Wiggins* merely relied on the presentence investigation report and department of social services records. In addition to falling below the standard local practice in defending Maryland capital cases, the Court wrote that the attorney's "conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association–standards to which we long have referred as 'guides to determining what is reasonable.'" *Id.* (citing *Strickland*, 466 U.S. at 688; *Williams v. Taylor*, 529 U.S. at 396); *see also Rompilla*, 125 S.Ct. at 2465-66 & nn. 6-7; *Florida v. Nixon*, 125 S. Ct. 551, 562 (Dec. 13, 2004) (referencing the ABA Guidelines in a habeas challenge based on ineffective assistance of counsel).

§ 11.4.1(C), p. 93 (1989).[4] The current guidelines are even clearer that it is the duty of capital defense counsel to investigate "*neurological damage*." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.7 Commentary (rev. ed. 2003), *reprinted in* 31 Hofstra L. Rev. 913, 1022 (2003). This collection of professional norms highlights the importance of mental health investigation in capital cases:

> In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment . . . are common among persons convicted of violent offenses on death row. Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings . . . . [T]he defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase."

*Id.* § 4.1 Commentary, *reprinted in* 31 Hofstra L. Rev. 913, 956. Clark's counsel would be found deficient in failing to investigate his mental health history even had counsel not been made aware of Clark's condition by his pre-trial expert. With notice of Clark's brain damage, counsel's failure to conduct further investigation is all the more outrageous. Our Court's opinion to the contrary simply refuses to apply ABA Guidelines and the *Rompilla* case.

## B. Prejudice

Surprisingly, the Ohio courts also held that the failure of Clark's trial counsel to present evidence of organic brain damage and its effects did not prejudice Clark. The Ohio post-conviction trial court and the Ohio Court of Appeals found that Dr. Gelbort's testimony concerning Clark's congenital brain defects "would have been cumulative at best." *State v. Clark* , 1998 WL 484119 at *8. The state court asserts that Gelbort's report echoes the testimony of Dr. Hy Kisin, a clinical psychologist who testified on Clark's behalf during the sentencing phase of the trial. But, finding Dr. Gelbort's report to be cumulative flies in the face of logic, the record itself, as well as Supreme Court precedent.

Seemingly, by using the term "cumulative," the state court was suggesting that similar expert testimony along the lines of Dr. Gelbort's report would have been redundant or added little to no new information to the record. When testimony or exhibits are found to constitute a "needless presentation of cumulative evidence," courts can generally refuse to admit the evidence. *See* Fed. R. Evid. 403. As one of our sister circuits has written, "[e]vidence is 'cumulative' when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of trial, with all the potential for confusion, as well as prejudice to other litigants, who must wait longer for their trial, that a long trial creates." *United States v. Kizeart* 102 F.3d 320, 325 (7th Cir. 1996); *see also, United States v. Ives*, 609 F.2d 930 (9th Cir. 1979) ("Cumulative evidence replicates other admitted evidence."). But, there is next to nothing that was presented to the sentencing jury in mitigation that even touches on Clark's mental deficiencies.

During the direct examination, Kisin testified concerning Clark's drug abuse, Trial Tr. at 89-90, 93-96; the death of Clark's father, *id.* at 91-93; the day of the murder and Clark's lack of intent to kill, *id.* at 97-103; Clark's remorse for the victim's death and Clark's suicide attempt, *id.* at 103-05; Clark's capacity for rehabilitation, *id.* at 105-06; and the fact that Clark's mother and children did not want him to be executed, *id.* at 107-08. There was absolutely no testimony concerning

---

[4]*See also Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003) ("Although the instant case was tried before the 1989 ABA edition of the standards was published, the standards merely represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases.").

Clark's organic brain syndrome or the deleterious effect of this mental defect on his functional capacity. The entire extent of Kisin's testimony concerning Clark's mental abilities is as follows:

> Q.       Now, Doctor, as a result again, every question is prefaced as a result of your interviews and discussions that you had with Joe and other individuals that you indicated, did you make any observations with regard to his level of intelligence?
> A.       Yes.
> Q.       And what was that observation?
> A.       That he, at best, operates on a dull normal level of intelligence and at worst in a borderline retarded way.

*Id.* at 96. The notion that Dr. Gelbort's testimony concerning congenital brain damage would add nothing to this isolated statement concerning intelligence is simply absurd on its face.

Clark's trial counsel introduced absolutely no medical evidence concerning his mental deficiencies. Counsel did not produce evidence of Clark's patient history or intelligence test data. Nor did counsel investigate and present evidence of the impact that drug abuse would have on Clark's congenital condition. There was absolutely no explanation of Clark's cognitive limitations. Dr. Gelbort's report indicates that Clark "is generally below what is considered to be the functional level on academic tests, as well as being functionally illiterate," and that "those portions [of Clark's memory] which support higher cognitive abilities such as abstract reasoning and complex problem solving are impaired." J.A. 267-68. Gelbort further explains that his "grossly impaired" memory functions could not support "higher cognitive functions such as being able to draw from his past experience and upon previously learned lessons." J.A. 268. Gelbort's report also indicated that Clark's cognitive limitations were exacerbated in new, complex or confusing situations:

> [W]ith more demanding cognitive tasks the patient was observed to have errors of impulsivity or to act in a disinhibited fashion. This is to say that, when participating in a complex ambiguous, confusing or rapidly evolving situation, Mr. Clark is likely to produce an impulsive or disinhibited type of response. Problem solving in new/novel situations or conditions was also moderately impaired with adequate performance seen on easier tasks but the patient being cognitively overwhelmed on the more complex measures.

*Id.*

Yet the state court maintains, and our Court appears to concur, that all of this is nothing new, because the psychologist had already told the jury that Clark "at best, operates on a dull normal level of intelligence and at worst in a borderline retarded way." The court of appeals reads the incredibly detailed observations of Clark by Dr. Gelbort to be a cumulative reiteration of this *one sentence* that was presented in the mitigation phase of the case. The record makes clear that there was no serious attempt by trial counsel to investigate Clark's mental deficiencies or cognitive limitations. As in *Rompilla*, "[t]his evidence adds up to a mitigation case that bears no relation" to that put before the sentencing jury. *Rompilla*, 125 S.Ct. at 2469. Courts sometimes decide that they want to reach a particular result, come what may, and simply forget about important facts and inconsistent legal principles. This form of "cognitive dissonance" seems to be what has happened in this case.

Clark was plainly prejudiced by his counsel's failure to follow up on red flags that appeared during the pre-trial hearing and that should have been discovered by any capital counsel adhering to the prevailing professional norms. The evidence of organic brain damage and cognitive limitations is nearly identical to the evidence that Rompilla's counsel would have discovered if they had followed up on the leads presented to them in their client's prison records, and the Supreme

Court found that Rompilla was prejudiced by his counsel's failure to investigate and discover this evidence. *Rompilla*, 125 S.Ct. at 2468-69. The readily available but undiscovered or ignored "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Clark's] moral culpability." *Wiggins v. Smith*, 539 U.S. at 538 (quoting *Williams v. Taylor*, 529 U.S. at 398). This Court should therefore reverse the decision of the District Court. The State of Ohio should either retry the case on penalty or stipulate to a life sentence.