The STATE of Ohio, Appellant,

v.

DIXON, Appellee.

[Cite as *State v. Dixon* (1995), 101 Ohio App.3d 552.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–94–223.

Decided March 3, 1995.

*Anthony G. Pizza*, Lucas County Prosecuting Attorney, and *Lawrence J. Kiroff*, Assistant Prosecuting Attorney, for appellant.

*Mark Geudtner* and *Joseph Scalzo, Jr.,* for appellee.

MELVIN L. RESNICK, Judge.

This interlocutory appeal comes before the court from the Lucas County Common Pleas Court, wherein appellee's, Archie Dixon's, motion to suppress was granted. Appellant, the state, asserts the following assignment of error:

"The trial court erred by suppressing a properly *Mirandized* voluntary statement on the grounds that police had failed to administer *Miranda* warnings to the defendant during an earlier custodial interrogation. Failure to administer *Miranda* warnings during a custodial interrogation does not bar admission of a subsequent properly warned and voluntary statement. *Oregon v. Elstad* (1985), 470 U.S. 298 [105 S.Ct. 1285, 84 L.Ed.2d 222]."

A suppression hearing commenced on March 18, 1994 with witnesses testifying to the following facts.

In the fall of 1993, Toledo police were investigating the disappearance of Christopher Hammer. He had periodically lived in a house with several people including appellee, Archie Dixon. In October 1993, Hammer's friends found his 1987 Dodge Daytona for sale on a used car lot located in Sylvania Township. On October 25, 1993, Detective Ron Scanlon of the Toledo police department went to the car lot. A salesman told Scanlon that they had bought the car from an individual who said he was Christopher Hammer. The salesman's physical description of the seller, however, did not match Hammer's description.

On November 4, 1993, Detective Scanlon returned to the used car lot. Two salesman immediately identified Dixon, from a single photograph, as the man who, on September 30, 1993, sold them the 1987 Dodge Daytona. Detective Scanlon next went to Dixon's residence to ask him some questions about Hammer. Dixon claimed he knew nothing of Hammer's disappearance. Later that day, Detective Scanlon paid a visit to the Sylvania Township Police Department to talk to Sylvania Township Detective Vern Snow. While the two detectives were talking, they overheard an individual at the front desk announce himself to be Archie Dixon. Dixon was attempting to get his impounded car released. The detectives went to the front counter and asked Dixon if he would mind talking to them about the disappearance of Hammer, and Dixon agreed. Detective Scanlon read Dixon his *Miranda* rights although Dixon was not under arrest. Before any questions were asked, Dixon stated he wanted to first talk to his attorney. Dixon made an appointment to come back to the station, with his attorney, on the following day. Dixon did not keep his November 5 appointment.

On November 8, 1993, Detective Scanlon went to the used car lot armed with a photographic array. Car lot owner Ron Parker selected Dixon's photo, out of

eight photos, and identified him as the man who had claimed to be Christopher Hammer, the seller of the 1987 Dodge Daytona. On September 30, Parker had issued a check for the vehicle in the amount of $2,800 payable to Christopher Hammer. The check was cashed that same day.

On November 9, 1993, Dixon was arrested for forgery. Detective Phil Kulakowski of the Toledo police department wanted to talk to Dixon about Hammer's disappearance. Before Dixon was initially interrogated, at approximately 11:30 a.m., Detective Snow spoke to Kulakowski about Snow's prior dealings with Dixon. Snow explained that Dixon was difficult to talk to at times and that he might not talk at all if he were Mirandized. Kulakowski decided not to read Dixon his *Miranda* rights. During the interrogation, Dixon referred to the fact that he had previously, on November 4, invoked his right to an attorney. He also admitted the forgery. Shortly after the interrogation concluded, Detective Kulakowski was notified that police had found the body of Christopher Hammer. At approximately 7:30 p.m. on November 9, Detective Kulakowski once again brought Dixon over to the police station from the jail for a second interrogation. Before any questions were asked of him, Dixon stated, "I heard you guys found a body." He went on to tell Kulakowski and another Detective present that he had talked to his attorney and his attorney had advised him to "tell everything." Kulakowski read Dixon his *Miranda* rights and Dixon agreed to sign a written waiver of those rights. Dixon then told the detectives that in September he had assaulted, restrained and buried Christopher Hammer alive. Both interrogations were tape-recorded.

On November 16, 1993, Dixon was indicted on three counts of aggravated murder with specifications, one count of kidnapping, one count of aggravated robbery, and three counts of forgery. On August 2, 1994, the trial court granted Dixon's motion to suppress the statements he made to the detectives in the two November 9, 1993 interrogations.

The state contends, in its sole assignment of error, that the trial court erred in suppressing the tape-recorded statements Dixon made to police in his second interrogation of November 9, 1993.

A suspect subjected to questioning in police custody must first be warned that (1) he or she has the right to remain silent, (2) anything he or she says can be used against him or her in a court of law, (3) he or she has the right to the presence of an attorney, and (4) if he or she cannot afford an attorney, if desired, one will be appointed for him or her prior to any questioning. *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 479, 86 S.Ct. 1602, 1612, 1630, 16 L.Ed.2d 694. An individual may waive his or her right to remain silent and to have a lawyer as long as the waiver is knowingly and intelligently made. *Id.*

In support of its assignment of error, the state cites *Oregon v. Elstad* (1985), 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222. *Elstad* addressed the issue of whether the initial failure of law enforcement officers to administer *Miranda* warnings, without more, taints subsequent admissions made by a suspect after he or she has been fully advised of and waived his or her rights. The facts of *Elstad* are as follows. In 1981, the Salem, Oregon home of the Gross family was burglarized. The local sheriff's department received a tip that eighteen-year-old Michael Elstad was involved. Two law enforcement officers obtained an arrest warrant for Elstad and went to his home. Elstad's mother let the officers into the home and directed them to her son's room. The officers asked Elstad to get dressed and come out to the living room. One of the officers asked Elstad's mother to go into the kitchen, where he explained to her that her son was a burglary suspect. The other officer remained in the living room with Elstad. He asked Elstad if he knew why the officers wanted to talk to him. Elstad answered "no." The officer asked him if he knew a family named Gross. Elstad responded affirmatively and added that he had recently heard there had been a burglary at their house. The officer said that he believed Elstad was involved. Elstad responded, "[Y]es, I was there." Approximately one hour later at the Sheriff's department, the officer advised Elstad of his *Miranda* rights, which Elstad promptly waived. He then signed a confession.

■ Elstad was charged with first-degree burglary. He moved to suppress both his oral and written statements. He argued that his initial unwarned oral statement "let the cat out of the bag" and tainted his written confession as "fruit of the poisonous tree" of the *Miranda* violation. The United States Supreme court disagreed, holding that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318, 105 S.Ct. at 1298. In such circumstances, a suspect's second Mirandized statement will be admitted into evidence if the suspect's waiver is deemed voluntary. The so-called voluntariness test requires an examination of the totality of the circumstances surrounding each confession. *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405.

■ "When police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Elstad, supra,* 470 U.S. at 317, 105 S.Ct. at 1297, 84 L.Ed.2d at 237. It is undisputed, in the present case, that the statements Dixon made in his initial interrogation of November 9, 1993 in the absence of warnings were properly suppressed.

■ In its decision, the trial court went on to find Dixon's subsequent statements suppressible under the authority of *Elstad* and other cases applying the "fruit of the poisonous tree" doctrine to Fifth Amendment violations. The trial court first recognized that the *Miranda* rights are not constitutionally required; rather, they are prophylactic measures to ensure protection of the Fifth Amendment right against compulsory self-incrimination. *Id.* at 305, 105 S.Ct. at 1290–1291, 84 L.Ed.2d at 229–230. Under the "fruit of the poisonous tree" doctrine, evidence and witnesses discovered as a result of a search in violation of the Fourth Amendment must be excluded from evidence. *Id.* at 305–306, 105 S.Ct. at 1290–1292, 84 L.Ed.2d at 230, citing *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. The trial court cited *Michigan v. Tucker* (1974), 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182, a Supreme Court case extending the "fruit of the poisonous tree" doctrine to violations of the prophylactic *Miranda* standards. There are two reasons, as discussed in the trial court's decision, for extending the doctrine. *Id.* at 446–448, 94 S.Ct. at 2364–2366, 41 L.Ed.2d at 194–195. The first reason is to deter improper police conduct. *Id.* at 447, 94 S.Ct. at 2365, 41 L.Ed.2d at 194. The second reason is to protect the courts from relying on untrustworthy evidence. *Id.* at 448, 94 S.Ct. at 2366, 41 L.Ed.2d at 195. Applying these principles, the *Elstad* court held:

"It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* at 309, 105 S.Ct. at 1293, 84 L.Ed.2d at 232.

In the present case, the trial court found that the statements made by Dixon in his second interrogation were the result of coercive, improper police tactics, specifically, Detective Kulakowski's deliberate and willful decision to forgo *Miranda* warnings before Dixon's initial interrogation. According to the trial court's decision, the "egregious and purposeful disregard of Dixon's *Miranda* rights" was so serious that the trial court was precluded from undertaking a voluntariness inquiry with respect to the statements Dixon made in his second interrogation.

■ There is no evidence that Dixon was subjected to coercive treatment or that his ability to exercise free will was impeded in any way when he was initially interrogated on November 9, 1993. Detective Kulakowski, unbeknownst to Dixon, deliberately chose to forgo the reading of Dixon's *Miranda* rights. The

sufficient and proper remedy for police misconduct such as this is the suppression of Dixon's statements made before he was warned. We do not believe that the effect of this particular misconduct, absent other evidence of coercive activity on the part of the police, reaches so far as to taint the later Mirandized statements of Dixon.

■ We now turn to a determination of whether Dixon's second confession was voluntary. Unlike Elstad, Dixon did not confess twice to the same crime. Dixon initially confessed to forgery, during a custodial police interrogation, without being advised of his *Miranda* rights. Approximately four hours later, Dixon was brought back to the police station to be interrogated again. This second interrogation was not arranged as a result of Dixon's previous statements made without warnings. Rather, the record shows that the second interrogation was arranged because the investigation into Christopher Hammer's disappearance had quickly turned into the investigation of Christopher Hammer's murder. Based on the totality of the circumstances, such as the different subject matter of the interrogations, the length of time between the two interrogations, and the fact that Dixon was familiar with his rights, having previously invoked them on November 4, we conclude that Dixon knowingly and voluntarily waived his *Miranda* rights on the occasion of his second November 9, 1993 interrogation. Accordingly, the state's sole assignment of error is found well taken.

The judgment of the Lucas County Common Pleas Court is reversed as to the suppression of statements Dixon made in his second November 9, 1993 interrogation. This case is hereby remanded to that court for disposition not inconsistent with this decision. Court costs are to be divided equally between the parties.

*Judgment reversed.*

ABOOD, P.J., and GLASSER, J., concur.