*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0372p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ARCHIE DIXON,

        *Petitioner-Appellant,*

    *v.*

MARC C. HOUK, Warden,

        *Respondent-Appellee.*

No. 08-4019

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 05-01290—James S. Gwin, District Judge.

Argued: August 5, 2010

Decided and Filed: December 9, 2010

Before: MERRITT, SILER, and COLE, Circuit Judges

─────────────────

**COUNSEL**

**ARGUED:** Michael J. Benza, LAW OFFICE OF MICHAEL J. BENZA, Chagrin Falls, Ohio, for Appellant. Thomas E. Madden, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Lawrence J. Whitney, BURDON & MERLITTI, Akron, Ohio, Henry DeBaggis, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellant. Thomas E. Madden, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

      MERRITT, J., delivered the opinion of the court, in which COLE, J., joined. COLE, J. (pp. 9–23) , delivered a separate concurring opinion. SILER, J. (pp. 24–29), delivered a separate dissenting opinion.

---

**OPINION**

---

MERRITT, Circuit Judge.  This is a coerced confession, death penalty case.  On November 4, 1993, at the police station house in Toledo, Ohio, petitioner Dixon, after receiving *Miranda* warnings, advised detectives that he would not voluntarily answer their questions without a lawyer present to advise him.  Notwithstanding his refusal to answer questions voluntarily, the detectives five days later devised a strategy to put pressure on Dixon to confess by questioning him, without *Miranda* warnings.  The primary habeas corpus issue raised by Dixon is what effect the deliberate, planned police decision to continue the questioning but not to give warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966) — a strategy  that also included an offer "to cut a deal" for Dixon rather than his confederate (Hoffner) — has on the admissibility of a confession rendered four hours later when he agreed to confess.

The detective told Dixon at the end of the unwarned interrogation, "Now is the time to say so [confess] because if Tim [Hoffner] cuts a deal it's kind of like a bus is leaving.  The first one that gets on is the only one that gets on."  *Ohio v. Dixon*, 805 N.E.2d 1042, 1051 (2004).  The police designed a strategy to get a coerced confession without giving *Miranda* warnings.  The confession would then be followed by the warnings given in a tape recording before the confession was recorded.  Based on this inverted sequence of events — refusal to answer after *Miranda* warnings, re-interrogation without warnings, confession, recorded warnings, recorded confession — the prosecution argues that the warnings after the initial confession made the confession "voluntary."  The question is whether the police can cleanse what would otherwise be an inadmissible confession in this way.  The Ohio trial judge said, "No," but he was reversed by the Ohio Supreme Court.  We agree with the trial judge.  A confession obtained by this kind of police pressure is inadmissible under *Miranda* and coerced and involuntary under the Due Process Clause.  If the consequences of this kind of deliberate, unlawful conduct specifically designed to violate *Miranda* and get a

confession is allowed to prevail, as our dissenting colleague contends, the time has come to simply overrule *Miranda*.

## I.  Factual and Procedural Background

On November 4, 1993, Dixon was interrogated at the police station and expressly exercised his right to remain silent unless a lawyer were present, although he had not been technically "arrested" at that time.  The detectives were, therefore, on notice that Dixon did not want to talk to them in the absence of his lawyer.  After his formal arrest for murder five days later on November 9, he was interrogated twice more.  The detective decided not to give him any *Miranda* warnings during the first of these two sessions because as the Ohio Supreme Court found, in agreement with the trial court, "the detectives believed that Dixon would invoke his right to counsel if he were issued *Miranda* warnings," which would foreclose further interrogation and defeat their effort to get a confession.  *Ohio v. Dixon*, 805 N.E.2d at 1049.  The detectives' coercive strategy succeeded; in the first session, Dixon confessed to a closely related crime.  Four hours later, in the second session, Dixon capitulated to the pressure.  The detectives advised him of his *Miranda* rights, and he confessed to the murder.

The Ohio trial judge immediately suppressed Dixon's statements confessing to the murder because "they were obtained as a result of a deliberate, bad faith plan on the part of the police to violate his rights" under *Miranda*, including an "ultimately false" statement by the interrogator in the form of a "promise of possible benefits" if Dixon confessed.  The trial judge also found that, although the detectives said that Dixon told them during the second interrogation on November 9 that he had talked to his lawyer by phone and was following his lawyer's advice to confess, this statement by Dixon was false.  The trial judge found that he had not talked to his lawyer and that no lawyer would likely have given him such advice.  *Ohio v. Dixon*, Trial Court Opinion and Journal entry, Appellant Appendix, Vol. 3, p. 1252.  The State took an interlocutory appeal on the suppression issue, and the Ohio Court of Appeals disagreed with the trial judge and found the confession admissible despite the deliberate violation of *Miranda*. *Ohio v. Dixon*, 656 N.E.2d 1 (1996).  (This decision was later upheld by the Ohio

Supreme Court.   805 N.E.2d 1042.)  Dixon was then convicted on the basis of the confession of a brutal murder in which he participated with his associate in burying the victim alive.  The Ohio jury sentenced him to death and then sentenced his associate to death.

After exhausting both his direct and state post-conviction appeals, Dixon filed for a writ of habeas corpus.  Unlike the Ohio trial judge, the district court did not find the interrogation to be coercive.  It followed the ruling of the Ohio Supreme Court on the *Miranda* violation and fully accepted its argument that *Oregon v. Elstad*, 470 U.S. 298 (1985), had held that confessions like the one in this case rendered under an "interrogate first, warn later" police strategy were admissible.  Because *Miranda* and *Elstad*, as well as many other cases, forbid this type of deliberately coercive police strategy that yields an involuntary confession, we reverse the district court and issue the writ of habeas corpus.

## II.  The Errors of the Ohio Supreme Court under AEDPA

To issue the writ, we must conclude that the state courts' adjudication (1) "involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."  28 U.S.C. § 2254(d).  The Ohio Supreme Court erred in *both* ways. First, its reliance on *Elstad* as the basis for admitting the confession involved an unreasonable application of that case.  Second, its finding that Dixon's confession, after first asking for a lawyer, was not influenced, caused, or coerced by the detectives' deliberate "confession first, warnings later" police strategy was based on an unreasonable determination of the facts and flatly contradicted the trial court's findings. The detectives planned to get a confession by violating the *Miranda* warning requirement after Dixon asked for a lawyer, and their plan worked four hours later when they returned for further interrogation and got the confession.

The Ohio Supreme Court relied on *Oregon v. Elstad*, 470 U.S. 298 (1985), for its conclusion that Dixon's confession was admissible and not coerced and involuntary under *Miranda* and Due Process. In that case, an officer mentioned a burglary when he came in to arrest the defendant at the defendant's home. The defendant immediately responded that he was involved. *Elstad* held that the momentary statement and response had "none of the earmarks of coercion" that is likely to produce an involuntary confession, *id.* at 316, and that the defendant's later full-dress confession at the station house after full and complete *Miranda* warnings was admissible. The Court in *Elstad* defined the concept of a "coerced" confession and distinguished the case from other cases in which the failure to warn was accompanied by "actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will." *Id*. at 309. In a later case, *Missouri v. Seibert*, 542 U.S. 600 (2004), the U.S. Supreme Court said that the holding in *Elstad* on its face was obviously designed to distinguish a case exactly like Dixon's in which the police follow a deliberate question-first, warn-later strategy. The Supreme Court in *Seibert* said that *Elstad* stands for the proposition that such a "police strategy adapted to undermine the *Miranda* warnings" renders the confession inadmissible "because the question-first tactic threatens to thwart *Miranda's* purpose of reducing the risk that a coerced confession would be admitted." *Id.* at 617. *Elstad* itself is clear, and *Seibert* simply reinforced its meaning.

In the instant case, five days before the question-first strategy was used, Dixon had made it completely clear to the police that he did not want to talk to the detectives without a lawyer present. Not only is the police strategy used here inconsistent with *Elstad* and *Seibert*, it contravenes the clear language of Chief Justice Warren's opinion in *Miranda* itself.

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; *any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise*. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice

> in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

*Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966) (emphasis added). The Supreme Court has consistently maintained that the bright-line rule of *Miranda* against further interrogation by police remains in effect. *E.g.*, *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

Moreover, in contrast to the finding of the Ohio Supreme Court that Dixon's statements at the evening interrogation four hours later were "voluntary" and not "the product of a compulsion, subtle or otherwise," the trial judge who heard the testimony of the witnesses found exactly the opposite. The trial court recounted that the detectives had engaged in a thirty-minute interrogation of Dixon before *Miranda* warnings were given and the tape recorder turned on. During that time they informed Dixon that his confederate, Hoffner, had led police to the buried body of the victim. They advised Dixon that they had not arrested Hoffner but let him go home, and then referred back to the earlier afternoon interrogation that had ended with the detective's advice to "get on the bus" because "the first one that gets on it is the only one" who will get a "deal."

This sequence of events is in direct conflict with the findings of the Ohio Supreme Court of "no coercion" or of the "voluntariness" of Dixon's confession. The Ohio Supreme Court attempted to purge the detectives' offer of the "deal" of any coercive effect by implausibly characterizing it only as a mere "admonition to tell the truth." On the contrary, the "cut-a-deal" dialogue was another step in the effort to get a confession by persuading Dixon that he had no right to silence or a lawyer but rather a duty to incriminate himself — the very opposite of his *Miranda* rights and his right to due process. Holding out the promise of a "deal" to avoid the death penalty in return for a confession, as the trial judge found, is a high-pressure tactic designed to override Dixon's previous five-day stand against talking. A confession given in response to such

tactics is not voluntary. *See Mincey v. Arizona*, 437 U.S. 385, 396-99 (1978) (positing a per se rule against use of such a coerced confession).

To summarize, there are three clear constitutional errors by the Ohio Supreme Court that remove the case from AEDPA deference under 28 U.S.C. § 2254(d):

1.  The Ohio Supreme Court unreasonably applied *Miranda v. Arizona* in refusing to require the police to terminate interrogation upon the exercise of the right to have a lawyer present and in allowing the police to demand involuntary answers by re-instituting the questioning without warnings.

2.  That court unreasonably applied *Oregon v. Elstad* by holding that the deliberate, planned refusal to warn, followed by warnings after confession should be treated the same as the momentary, innocent failure to warn in *Elstad*.

3.  That court's finding that Dixon's confession was voluntary resulted in a decision that was based on an unreasonable determination of facts presented in the state court proceeding. The "admonition" that Dixon should "cut a deal" was not simply "an admonition to tell the truth." It was part of the coercive strategy to get Dixon to confess involuntarily. In this conclusion, we are in accord with the court that actually heard the evidence and that was in the best position to determine the facts — the Ohio trial court.

In addition, the last violation occurred in part because the Ohio Supreme Court erroneously placed the burden of proof on Dixon to prove that his confession was coerced. That court concluded that "Dixon has failed to explain how the detective's coercive subjective intent coerced him to a greater extent than if the *Miranda* violation had been inadvertent." 805 N.E.2d at 1050-51. This view is contrary to Supreme Court law. *E.g.*, *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate to 'suppression' " and when shown "the state bears a 'heavy' burden in proving waiver"); *North Carolina v. Butler*, 441 US. 369, 373 (1979) (same). In *Miranda* itself the Court said that "a heavy burden rests on the government"; the satisfaction of this burden "will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession

was in fact eventually obtained." 384 U.S. at 475. Here the confession was "eventually obtained" but only after the police wore Dixon out with admittedly illegal interrogation, the only purpose of which was to get him to confess against his will. The police used both illegal questioning and, as the Ohio trial judge found, false enticement "to cut a deal."

Accordingly, the petition for writ of habeas corpus is granted pursuant to 28 U.S.C. § 2254(d) and the State has 180 days to retry Dixon. In light of our ruling on the coercive police interrogation issue, the other issues raised in the petition are pretermitted.

---

**CONCURRENCE**

---

COLE, Circuit Judge, concurring.  I concur in the majority opinion, but write separately because I would also grant Dixon's petition on his ineffective assistance of counsel claim.

**I.**

At the penalty phase, Dixon's counsel presented as "mitigating evidence" the testimony of an employee of the Bureau of Sentence Computation for the Ohio Department of Rehabilitation and Correction, who testified that Dixon would serve a life sentence with no chance for parole.  Counsel also admitted into evidence a copy of Dixon's birth certificate to establish his youth.  Dixon contends that his counsel's failure to present additional mitigating evidence constitutes ineffective assistance of counsel. He argues specifically, that evidence of his family history, which included evidence of domestic violence, sexual abuse, alcoholism, possible incest, and lack of positive role models, should have been presented.  The Warden answers that if any such evidence had been introduced, it would have opened the door for the prosecution to introduce evidence of Dixon's bad character and prior bad acts.

The district court held an evidentiary hearing on Dixon's ineffective assistance of counsel claim. (R. 75.)  It applied the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 *et seq*., to Dixon's petition, and under its deferential standard of review the district court affirmed the Ohio Court of Appeals' denial of Dixon's ineffective assistance claim. (R. 79, at 42.)  Both parties on appeal agree AEDPA governs this claim; however, we must make an independent determination as to whether AEDPA applies.  *Brown v. Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008).

In this case, AEDPA does not govern Dixon's ineffective assistance of counsel claim.  When "new, substantial evidence" is presented to a federal district court on a habeas claim that was not before the state court, the state court's determination of the

issue could not have been on the merits, and thus is not entitled to AEDPA deference. *Brown*, 551 F.3d at 429 (holding that the rule announced in *Joseph v. Coyle*, 469 F.3d 441, 469 (6th Cir. 2006), that AEDPA does not apply to habeas claims premised on *Brady* material that appears for the first time during federal proceedings "applies generally"). This rule only applies, however, if the threshold standard for admitting new evidence is met.

In *Brown*, we found that the district court erred in applying AEDPA to the ineffective assistance claim on habeas review because "the counseling notes that form[ed] the basis of the claim were not in the record before the Michigan Court of Appeals, and that court explicitly acknowledged that its review was limited to mistakes apparent on the record." *Id.* at 428-29 (internal quotation marks and citation omitted). On post-conviction review, the Ohio Court of Appeals applied the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and held that Dixon failed to prove his ineffective assistance of counsel claim after reviewing the evidence Dixon submitted to support his claim, a report prepared by a mitigation specialist and affidavits from several individuals. *State v. Dixon*, 2000 WL 1713794, at *16 (Ohio Ct. App. Nov. 17, 2000). At the federal evidentiary hearing, the district court heard evidence not before the state court through the testimony of Dixon's trial counsel, Mark Geudtner and Joe Scalzo, as well as Gary Ericson (the mitigation specialist hired by Dixon's trial counsel), Dr. Christopher Layne (the psychologist hired by Dixon's trial counsel) and Anna Marie Dixon (Dixon's mother). The district court thus based its decision to deny Dixon's petition for habeas corpus, at least in part, on "new, substantial evidence," *Brown*, 551 F.3d at 429, not previously before the state courts. Therefore, AEDPA will not apply if the district court properly allowed Dixon to admit new evidence.

In order to admit new evidence on a habeas petition before a district court, the following standard must be met: "(1) the petitioner must not be at fault for failing to develop the evidence in state court, or (2) if the petitioner is at fault, the narrow exceptions set forth in 28 U.S.C. § 2254(e)(2) apply." *Brown*, 551 F.3d at 429 (citing *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004)). We review a district court's decision

to hold an evidentiary hearing under an abuse-of-discretion standard. *Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir. 2001). The district court found that Dixon diligently sought an evidentiary hearing in the state courts, was repeatedly denied, and was not at fault for failing to develop the record in state court. (R. 79, at 21.) If a petitioner is not barred by 28 U.S.C. § 2254(e)(2) from receiving an evidentiary hearing, the district court has discretion to grant a hearing, *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007), but it must consider whether a hearing "could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474. Dixon alleged that his counsel failed to create a mitigation strategy and had no strategic reason for their failure to present mitigation evidence. The district court correctly concluded that if these factual claims were true, it could entitle Dixon to relief on his ineffective assistance claim. Therefore the district court did not abuse its discretion in granting an evidentiary hearing on this claim.

Because the district court's decision rested on properly admitted "new, substantial evidence," AEDPA is inapplicable and "the pre-AEDPA standard of review [applies]: de novo for questions of law (including mixed questions of law and fact), and clear error for questions of fact." *Brown*, 551 F.3d at 430. "The performance and prejudice components of *Strickland* present mixed questions of law and fact and are reviewed de novo." *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008).

## II.

To prevail on an ineffective assistance of counsel claim, "the petitioner must show that: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Keith v. Mitchell*, 455 F.3d 662, 670 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 687 (1984)).

### A.　　Deficient Performance

Dixon contends he was denied the effective assistance of counsel because his counsel failed to investigate and present relevant mitigating evidence during the penalty phase. Dixon had the assistance of Joe Scalzo and Mark Geudtner during both the guilt

and penalty phases of his trial. At the outset, they divided the responsibilities between them; Geudtner was responsible for the pretrial motions and the trial, and Scalzo was responsible for the penalty proceedings. In preparation for the penalty phase, they hired Ericson, a licensed private investigator and mitigation specialist, and Dr. Layne, a clinical psychologist. Ericson completed a fifty-one page mitigation report that included extensive evidence of Dixon's dysfunctional family and social history, and gave the report to Scalzo. Ericson met with defense counsel early in the process, but had no contact with them after that and never discussed his report with either Scalzo or Geudtner. Dr. Layne conducted a battery of psychological tests on Dixon, but concluded that the results would not have been helpful to Dixon in the penalty phase and did not complete his report.

Geudtner testified that he realized at the end of the trial that Scalzo had prepared insufficiently for mitigation. Thus, Geudtner spent the weekend after the guilty verdict was rendered developing three arguments to put before the jury in the mitigation phase.[1] Geudtner planned to introduce evidence showing that: (1) Dixon had served eight months in jail for a crime for which he was later exonerated by DNA evidence; (2) Dixon offered to plead guilty if the death penalty were not sought and the prosecution rejected his offer; and (3) other capital cases in the area did not result in the death penalty for those defendants. Geudtner did not seek a ruling from the trial court on whether such evidence would be admissible at the penalty phase, however, and the court prohibited Geudtner from presenting it. Geudtner explained that he did not seek a ruling on the admissibility of this evidence prior to the start of the penalty phase because he did not want to give the prosecution a preview of his strategy. Unfortunately for Dixon, this left defense counsel unclear about their overall strategy; the trial court granted a continuance only until that afternoon for counsel to develop a mitigation strategy.

---

[1]To the extent that Geudtner tried to compensate for his co-counsel's failures, his efforts are laudable. They do not, however, constitute effective assistance. Failure to begin mitigation preparations before the close of the guilt phase is objectively unreasonable under *Strickland*. *See Jells v. Mitchell*, 538 F.3d 478, 493 (6th Cir. 2008) (collecting cases).

A defendant has "a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." *Williams v. Taylor*, 529 U.S. 362, 393 (2000). In order to prove his counsel were deficient, Dixon must show "that his 'counsel's representation fell below an objective standard of reasonableness.'" *Awkal v. Mitchell*, 613 F.3d 629, 638 (6th Cir. 2010) (en banc) (quoting *Strickland*, 466 U.S. at 688). When deciding whether counsel's assistance was deficient at the penalty phase we do not decide "'whether counsel should have presented a mitigation case,' but rather, 'whether the investigation supporting counsel's decision not to introduce mitigating evidence of [petitioner's] background was itself reasonable.'" *Jells v. Mitchell*, 538 F.3d 478, 491 (6th Cir. 2008) (quoting *Wiggins v. Smith*, 539 U.S. 510, 523 (2003)). When determining the reasonableness of counsel's investigation, the "quantum of evidence known to counsel must be considered, as well as whether that evidence should have led a reasonable attorney to investigate further." *Clark v. Mitchell*, 425 F.3d 270, 284 (6th Cir. 2005) (citing *Wiggins*, 539 U.S. at 527).

Dixon argues that his counsel were deficient in failing to introduce mitigating evidence of Dixon's dysfunctional family and social history, which included domestic violence, possible incest, alcoholism, and negative role models, and by failing to call the following witnesses: his mother, older brother, and his foster parents Nancy and Dale Wolfe. The Warden argues that defense counsel's "life means life" mitigation theme was a strategic decision not to introduce details of Dixon's past in order to avoid the admission of evidence of Dixon's bad character and prior bad acts. Dixon claims that it was deficient for his counsel not to consider a way to cabin witnesses' testimony to avoid introduction of such evidence and for failing to make a motion in limine to exclude his prior conviction.

*Strickland* dictates that counsel's performance must be evaluated "under prevailing professional norms." 466 U.S. at 688. "[T]he ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases." *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003). The Supreme Court has clarified though, that

"[r]estatements of professional standards . . . can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." *Bobby v. Van Hook*, — U.S. —, 130 S.Ct. 13, 16 (2009) (citing *Strickland*, 466 U.S. at 688) (explaining that looking to the ABA guidelines announced eighteen years after [the defendant] went to trial ignored the limitations set by *Strickland*). The guilt and penalty phases of Dixon's trial were conducted in October-November 1995. Therefore, the guidelines in place at that time, the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), are useful in determining what constitutes reasonable representation. As explained in the guidelines, "[c]ounsel should consider all pretrial motions potentially available" to address issues such as "matters of evidence or procedure at either the guilt/innocence or penalty phase of trial which may be appropriately litigated by means of a pretrial motion in limine." *Id.* at § 11.5.1. With regards to presentation of evidence at sentencing, counsel should present "all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence." *Id.* at § 11.8.6. The ABA guidelines support the commonsense notion that when faced with the possibility of the prosecution introducing damaging rebuttal evidence, counsel should make reasonable efforts to prevent this from occurring.[2]

Neither of Dixon's attorneys filed a motion in limine to prohibit Dixon's past conviction from being admitted,[3] nor did either attorney speak with any of the potential witnesses or Ericson to develop a strategy to present mitigating evidence without permitting the admission of potentially aggravating evidence from Dixon's life. Of

---

[2]The 2003 revised edition explicitly addresses this scenario and states that

> when faced with the possibility that any portion of the defense case will open the door to the prosecution's presentation of otherwise inadmissible aggravating evidence[,] [c]ounsel should pursue all appropriate means (e.g., motions in limine) to ensure that the defense case concerning penalty is constricted as little as possible by this consideration.

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, § 10.11 (2003 rev. ed.).

[3]Defense counsel filed a motion to exclude any evidence of other crimes, wrongs, or acts on December 5, 1993, almost two years before the trial began. The trial court denied the motion finding that "any evidentiary issues dealing with other criminal acts [would be] dealt with during trial as they arose." Nothing in the record indicates this issue was ever revisited by either party or the court.

course, if there were no legal avenue for counsel to pursue to prevent such evidence from being admitted, failure to do so could not be considered unreasonable. A brief examination of Ohio law is therefore necessary to determine whether counsel's lack of investigation of this issue was constitutionally deficient.

Under Ohio law, the "history, character, and background of the offender" is a statutory mitigation factor, Ohio Rev. Code § 2929.04(B), and defendants have "great latitude in the presentation of evidence of [mitigation] factors." Ohio Rev. Code § 2929.04(C). The Ohio Supreme Court has found that the prosecution's burden of proving beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors "empow[ers]" the prosecutor "to rebut mitigation evidence offered by the defendant where the prosecutor has a good faith basis for believing that such evidence is false." *State v. DePew*, 528 N.E.2d 542, 554 (Ohio 1988). But this rebuttal is limited "to those instances where the defense offers a *specific assertion*, by a mitigating witness or by the defendant, that misrepresents the defendant's prior criminal history." *State v. Henness*, 679 N.E.2d 686, 698 (Ohio 1997) (emphasis added). Additionally, evidence of a defendant's good character presented at mitigation allows the prosecution to rebut with evidence of the defendant's prior bad acts. Ohio R. Evid. 404(A)(1); *see also State v. Jalowiec*, 744 N.E.2d 163, 177-78 (Ohio 2000) (explaining that defendant opened the door to rebuttal by "call[ing] several witnesses [at sentencing] to testify about what a good person he was.")[4]

The relevant law demonstrates that evidence misrepresenting Dixon's criminal past, or evidence of his good character, might have opened the door to rebuttal evidence by the prosecution. *See Jalowiec*, 744 N.E.2d at 177 ("The trial court has discretion to determine what relevant evidence is admissible as proper rebuttal."). But more importantly, the details of Dixon's dysfunctional family history would not. We previously found this to be true when interpreting Ohio law in *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003). In *Mason,* we explained that, "[t]estimony that simply put

---

[4]The Ohio rules of evidence apply to the penalty phase of a capital trial. *State v. Lorraine*, 613 N.E.2d 212, 220 (Ohio 1993).

Mason's childhood into context without misrepresenting it would not have been subject to the prosecutor's rebuttal evidence[.]" *Id.* at 627; *see also id.* at 622 ("[T]estimony in this case concerned Mason's troubled childhood . . . which would have aided him at sentencing because it did not give the prosecutor the same opportunity for rebuttal that evidence about good character or rehabilitation potential could have.")

This case is similar to *Mason* in another important respect. In *Mason*, defense counsel obtained *some* mitigating information, and we explained that "the limited information obtained by defense counsel did not *discharge* counsel's duty to investigate, but *triggered* the duty to investigate." *Mason*, 320 F.3d at 624 n.12. To determine the reasonableness of counsel's investigation, we look at the "quantum of evidence known to counsel" and whether "that evidence should have led a reasonable attorney to investigate *further.*" *Clark*, 425 F.3d at 284 (citing *Wiggins*, 539 U.S. at 527) (emphasis added).

Here, Dixon's counsel had a detailed, thorough mitigation report and several witnesses willing and available to testify, yet neither attorney investigated a way to *use* any of this evidence, either by discussing with potential witnesses or Ericson a way to limit their testimony to only those subjects that would not "open the door" for the prosecution, or by filing a motion in limine in the hope that the court would deny admission of Dixon's prior conviction. Scalzo explained that he was concerned about the jury learning of Dixon's criminal history, but also acknowledged that the evidence could be found too prejudicial to be admitted. Scalzo could not remember if he and Geudtner ever discussed the possibility of filing such motions, and there is no evidence they ever discussed the mitigation phase. Geudtner stated that he left preparation of the mitigation phase entirely to Scalzo, and realized at the end of the guilt-phase portion of the trial that Scalzo "hadn't prepared much" and "pretty much fell flat on his face." He described Scalzo's performance as "overwhelmingly deficient."

To determine the reasonableness of counsel's mitigation strategy, "'a reviewing court must consider the reasonableness of the investigation said to support that strategy.'" *Jells v. Mitchell*, 538 F.3d 478, 492 (6th Cir. 2008) (quoting *Wiggins*,

539 U.S. at 527). Given the "great latitude" Ohio grants defendants in the presentation of mitigation evidence, "professionally competent assistance in Ohio capital cases" requires a "reasonably thorough investigation into all possible mitigation evidence that would present a sympathetic picture of the defendant's family, social, and psychological background." *Id.* at 495-96 (citing *Wiggins*, 539 U.S. at 524). "Strategic choices made after thorough investigation of *law* and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91 (emphasis added); *see also Spisak v. Mitchell*, 465 F.3d 684, 704 (6th Cir. 2006) ("[A]ny decision to forego mitigation evidence is unreasonable if not made after a reasonable determination to cease further investigation."), *overruled on other grounds by Smith v. Spisak*, 554 U.S. — , 130 S. Ct. 676 (2010). If counsel stops short of a thorough investigation, however, "'the deference owed to counsel's strategic judgments about mitigation is directly proportional to the adequacy of the investigations supporting such judgments.'" *Eley v. Bagley,* 604 F.3d 958, 973 (6th Cir. 2010) (quoting *Jells*, 538 F.3d at 492).

Dixon's counsel did not speak with any of the witnesses who could have testified on Dixon's behalf. Without any investigation regarding the extent to which rebuttal evidence might be allowed, defense counsel abandoned the idea of introducing any evidence related to Dixon's extremely dysfunctional family in favor of a "life means life" mitigation theme. Scalzo described his mitigation strategy as, "to go on more economical things: How long is a person supposed to live while in prison, how much is it going to cost, versus giving him death, from an economic standpoint." Geudtner, who began working on the penalty phase the weekend before it was set to begin, after learning Scalzo had prepared nothing, testified that he never read Ericson's report. Counsel's failure to make a thorough investigation of either law or facts made "a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527-28. Counsel's decision not to present any of the evidence available to them in

mitigation was not reasonable and their performance at the penalty phase was deficient under *Strickland*.[5]

### B.     Prejudice

A finding of deficient performance alone is insufficient for Dixon to prevail on an ineffective assistance of counsel claim. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. He must also demonstrate prejudice, that is, a reasonable probability that the newly available mitigation evidence would have led to a different outcome. *Wiggins*, 539 U.S. at 537. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, if there is a reasonable probability that a single member of the jury would have found that the aggravating circumstances of the crime did not outweigh the mitigating circumstances, Dixon is entitled to a new penalty-phase trial. *See State v. Robb*, 723 N.E.2d 1019, 1044 (Ohio 2000) (only a unanimous jury can impose death). Dixon has met this burden.

To determine prejudice we must "reweigh the mitigation evidence against the evidence of aggravation. . . . including evidence presented in habeas proceedings." *Williams v. Anderson*, 460 F.3d 789, 804 (6th Cir. 2006). "Prejudice is established where, taken as a whole, the available mitigating evidence might well have influenced

---

[5]Counsel's deficient performance at the mitigation phase is particularly troubling when viewed within the larger trial context. Counsel put on no case-in-chief and cross-examined only three of the state's fifteen witnesses at the guilt-phase portion of the trial. The trial transcript of the state's witnesses was 364 pages long, with only eight of the pages covering cross-examination. Scalzo agreed that "there was very little cross-examination of any witness." Geudtner described their strategy once the trial started as to "pretty much just to sit there and take it," because he did not feel that they had "much of a chance to prevail on the guilt phase of the trial."

Furthermore, Scalzo's other explanation for not presenting mitigating evidence is similarly unreasonable. Scalzo explained that he did not present evidence of Dixon's family history because "it was from our experience that juries weren't buying that. In the situation—I didn't want to upset them any more than they already were about the crime." Counsel's explanation that he viewed the report as not helpful is not a strategic decision, but rather "an abdication of advocacy." *Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997) (finding counsel's failure to present mitigating witnesses "because he did not think it would do any good," even though several friends, relatives, experts and a minister were available and willing to testify, "an abdication of advocacy" and not a strategy). When a defendant has been found guilty of death penalty charges, he is "virtually guaranteed a sentence of death unless he [can] produce sufficient mitigation evidence at the penalty phase to generate reasonable doubt in the mind of at least one juror." *Frazier v. Huffman*, 343 F.3d 780, 793 (6th Cir. 2003).

the sentencer's appraisal of the petitioner's moral culpability." *Jells*, 538 F.3d at 498 (citation and internal quotations omitted).

The jury found Dixon guilty of the following aggravating circumstances presented at sentencing: (1) that he was the principal offender and committed the murder during a robbery and kidnapping; and (2) that he had committed the murder with prior calculation and design. *Dixon*, 805 N.E.2d at 1058. The evidence submitted at the penalty phase in mitigation was Dixon's age at the time of the offense (twenty years old) and the testimony of the Chief of the Bureau of Sentence Computation, who testified to the time of actual incarceration if the jury recommended a life sentence. The jury did not hear any evidence related to Dixon's background.

In support of his ineffective assistance claim, Dixon submitted Ericson's report along with affidavits from James Eisenberg (a forensic and clinical psychologist), Paul Dixon, Jr. (Dixon's brother), Anna Marie Dixon (his mother), Nancy Wolfe (his former foster mother), David Lewis (his high-school wrestling coach), and testimony of several individuals from the federal court evidentiary hearing. Ericson's mitigation report, more than fifty pages in length, was the result of a comprehensive review of a multitude of records, including, school, employment, hospital, psychological, and court records, as well as interviews with Dixon's mother, brother, former foster parents, former probation officer, a deacon and Dixon's church, and the mother of Dixon's girlfriend.

The report revealed the following details about Dixon. His family life was dysfunctional and abusive, and he had no positive role models, outside of approximately eighteen months living with foster parents. There was a family history of alcoholism. Dixon's father, uncle, paternal grandfather, and both maternal grandparents were alcoholics, and his mother had a "drinking problem." Dixon's father was arrested between seven and ten times for driving under the influence of alcohol and was ordered by a court to attend an alcohol treatment program.

Dixon's father physically abused him. Lucas County Children Services records revealed a history of abuse of both Dixon and his brother by both parents, but that Dixon's father was "particularly abusive when drinking especially to [Dixon]." Indeed,

Dixon's mother filed, but later dropped, several domestic violence charges against Dixon's father. His father's violence was not limited to Dixon, however. Dixon's foster mother described how employees at the local court feared Dixon's father because he had once made a death threat to a court employee. One evening, Dixon's father shot six rounds of his shotgun from inside the home because he was angry at Dixon's mother.

The accounts of abuse Dixon endured from his father are particularly troubling. The father hit Dixon with a baseball bat, "kicked" him, "smacked" him, and "lost control" with Dixon. In one instance, Dixon did not do what his father asked, causing his father to "put his steel toed boots on" and kick Dixon "like a man;" as a result, one of Dixon's ribs is deformed. In another incident, Dixon's father hit him in the face so hard it left fingerprints. The police were called, but his mother explained that "luckily" Dixon was asleep, with his face down where he had been hit. The police left without any further investigation or arrest. Dixon himself described his father as "very aggressive" and stated that his father beat him a number of times; Dixon's brother described their father as "explosive."

Ericson further reported that Dixon himself suffered from alcohol abuse, polysubstance abuse, anxiety and depression. He began taking drugs when he was thirteen years old, when "behavioral and family issues were most significant." He attended a treatment and rehabilitation center, and "[a]ttention was given to his lack of understanding of the negative consequences of his drug involvement and the lack of a male role model." Ericson's report summarized medical records indicating that individual counseling was recommended due to the high level of dysfunction within the family, but that the family could not be motivated to follow through with these suggestions.

Additionally, Dixon's brother, Paul Dixon, Jr., a Marine based in North Carolina, was available to testify on Dixon's behalf. Paul explained how he spent little time at home during his youth, and how an environment away from his home allowed him to "have abilities and qualities that are basic to most people, but not common to my immediate family." He described his family as "extremely tense," "often disruptive and

perhaps dysfunctional." He attested that Dixon did not have the benefit of an extended removal from the family as he did, and how Dixon was "negatively affected because of it."

Paul's statements are supported by Dixon's former foster parents, Nancy and Dale Wolfe—who had Dixon in their care for about one to one and one half years. They "observed a major backslide [in Dixon's behavior]" and how he "became very defiant" and "belligerent" when the court decided to release him back to his parents. Nancy Wolfe explained how Dixon "modeled his behavior after his father." Dixon told Dale Wolfe that he was fearful of his father and did not want to go home.

There is also evidence of incest and sexual abuse within the family. Dixon's sister was repeatedly molested by her maternal grandfather as a child. Records from Lucas County Children Services indicate that sexual contact and possible intercourse occurred between both brothers and their sister, as well as their father and their sister. Both parents resisted counseling and characterized their sons' behavior as "normal curiosity."

A case worker with the Lucas County Court of Common Pleas, Juvenile Division, did a case assessment on the Dixons after several sessions with the family. He described sexual encounters between the siblings and felt they learned such behavior from their father. When asked about the sexual inappropriateness, Dixon's father threatened the case worker and told him he was "asking for serious trouble." The case worker explained how the Dixon family was given the worst score regarding "family system pathology" from "day one," never improved, and was one of the worst families with which he had worked.

The Warden argues that details of Dixon's childhood would have had little or no effect on his sentence. The evidence belies such a conclusion. The evidence shows Dixon's family history was filled with chronic alcoholism, domestic violence, possible incest, and negative role models. As Dr. Eisenberg explained, this information would have provided the jury with "insight and understanding into the development of Dixon's

personality and pathology," and "an understanding of the family dynamics that lead to Mr. Dixon's violent behavior."

The circumstances of the crime are heinous, there is no doubt. But at no point during the trial did the jury hear any details of Dixon's dysfunctional and abusive upbringing. It is arguable whether any *actually* mitigating evidence was presented. The introduction of Dixon's birth certificate showed the jury that he was above the age of eighteen when he committed the offense. The testimony of the Bureau of Sentence Computation employee was even less helpful, as the Ohio Supreme Court explained that "sentence computations [are] entitled to no weight in mitigation." *Dixon*, 805 N.E.2d at 1062 (citing *State v. White*, 709 N.E.2d 140, 155-56 (Ohio 1999). The large discrepancy between the nominal evidence given to the jury and the available evidence of Dixon's dysfunctional family life demonstrates a reasonable probability that at least one member would not have returned a sentence of death. *See Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (finding prejudice where the evidence not presented at sentencing "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury").

The evidence of Dixon's family history would have presented the jury with a different calculation to make at the penalty phase. As we have explained before,

> 'I and the public know [w]hat all schoolchildren learn,' it has been said, "[t]hose to whom evil is done [d]o evil in return." W.H. Auden, "September 1, 1939." While these words may not capture a satisfactory theory of morality, they assuredly suggest a plausible theory for sparing a life at a mitigation hearing[.]

*Johnson v. Bagley*, 544 F.3d 592, 606 (6th Cir. 2008) (finding prejudice under *Strickland* because the new evidence differed "from that heard by the jury not only in degree but also in kind"); *see also Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse.").

In *Williams v. Anderson*, we found prejudice when similar facts were not presented as mitigating evidence, namely, the defendant's alcoholic and abusive mother, lack of father figure, primary male role model's career as a criminal, and a violence-condoning environment. 460 F.3d 789, 804-05 (6th Cir. 2006); *see also Morales v. Mitchell*, 507 F.3d 916, 951 (6th Cir. 2007) (Suhrheinrich, J., dissenting) (noting we have "found prejudice when the jury was deprived of non-cumulative mitigating evidence such as severe physical, psychological, or sexual abuse, a violent upbringing, or abject poverty"). Additionally, we have found prejudice where the jury heard little to no evidence in mitigation when compared to what evidence could have been presented on the defendant's behalf. *See Hamblin v. Mitchell*, 354 F.3d 482, 490, 493 (6th Cir. 2003) (finding prejudice where counsel did not present the jury with any mitigating evidence and evidence of a childhood where "abuse, neglect, violence and hunger were common" existed); *Frazier*, 343 F.3d 780, 797 (6th Cir. 2003) (no evidence presented at the penalty phase except the defendant's one-sentence plea for mercy and defense counsel could have presented evidence of defendant's brain injury).

Dixon's case is no different from those where have found prejudice in both respects. The jury heard no evidence during the guilt phase of the trial that could be considered mitigating. And the evidence presented at the penalty phase did not address any actual mitigating factors. Furthermore, the evidence of Dixon's extremely dysfunctional family never heard by the jury is similar to evidence in cases where we have found prejudice. Had Dixon's counsel presented to the jury evidence of the abusive and tragic upbringing Dixon experienced, there is a reasonable probability that at least one juror would have voted not to put him to death. Indeed, given the circumstances of the offense, the submission of such evidence is precisely what was called for during the penalty phase. The failure by Dixon's counsel to present any of this evidence was constitutionally deficient by any measure.

Accordingly, while I join the majority opinion, I would also reverse the district court's denial of Dixon's petition for a writ of habeas corpus on his ineffective assistance of counsel claim.

———————————

## DISSENT

———————————

SILER, Circuit Judge, dissenting.  I respectfully dissent from the majority opinion finding that the Ohio Supreme Court unreasonably applied clearly established federal law in deciding this case based on the evidence presented in the state court under 28 U.S.C. § 2254(b).  Whether this court would rule otherwise is not the issue.  Instead, we must look at *State v. Dixon*, 805 N.E.2d 1042 (Ohio 2004), to see if it was contrary to 28 U.S.C. § 2254(b).  As the majority indicates, the Ohio Supreme Court found that the second statement by Dixon to the officers on November 9, 1993, was admissible under the authority of *Oregon v. Elstad*, 470 U.S. 298 (1985).

Although Dixon has argued that the Ohio Supreme Court should have followed *Missouri v. Seibert*, 542 U.S. 600 (2004), I agree with the majority when it indicates that the *Seibert* decision was not binding upon the Ohio Supreme Court at the time it decided *State v. Dixon*.  The Ohio Supreme Court rendered its opinion in *Dixon* on April 14, 2004, and denied reconsideration on June 9, 2004.  *Seibert* was not decided by the United States Supreme Court until June 28, 2004.  Nevertheless, we can review what *Seibert* said about *Elstad*.

The facts in this case resemble the facts in *Elstad* and *Seibert*, but are easily distinguished.  In *Elstad*, the accused made an initial inculpatory statement without *Miranda* warnings at the time of his arrest at his home.  His  subsequent confession at the sheriff's office one hour later after being advised of his *Miranda* rights was admissible.  In *Seibert*, the accused was questioned first for 30 to 40 minutes without *Miranda* warnings.  After admitting her guilt, Seibert was given a 20-minute break, after which the officers advised her of her *Miranda* rights, and she then admitted her guilt again.  However, as stated above, the Ohio Supreme Court did not have the *Seibert* decision as evidence of clearly established federal law at the time of its decision in *Dixon*.

In our case, the officers at the time of the first interrogation on November 9 deliberately decided not to use the *Miranda* warnings, because they thought Dixon would invoke his right to silence. Later, at the second interrogation on November 9, circumstances had changed significantly. First, Dixon was initially arrested for forgery, not murder. At the time of the first interrogation, the officers knew of the disappearance of Hammer, the victim, but had not found the buried body. The first interview lasted approximately 45 minutes, and the police focused their questions on Hammer's disappearance. Dixon denied knowledge of Hammer's disappearance during that interrogation, but admitted the forgery of Hammer's automobile title. *Dixon*, 805 N.E.2d at 1049. Also significant is that between the time of the first interview on November 9, which concluded at 3:30 p.m., and the second interview, which began at 7:30 p.m., the police found Hammer's body. At the second interview, before being questioned, "Dixon volunteered that he had heard that police had found the body and asked whether Hoffner [co-defendant] was in custody." *Id.* Dixon also said that he had talked to his attorney and wanted to tell the police what happened. The majority says that the trial judge found otherwise, but the Ohio Supreme Court found that he told this to the detectives questioning him. *Id.* at 1050. After being advised of his *Miranda* rights twice and signing a waiver-of-rights form, Dixon implicated himself in Hammer's death. *Id.*

The Ohio Supreme Court correctly followed federal law. In *Elstad*, the Supreme Court emphasized the coercive effect of the initial interview without *Miranda* warnings. Thus, it said:

> There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a "guilty secret" freely given in response to an unwarned but noncoercive question, as in this case.

*Elstad*, 470 U.S. at 312. It went on to hold "that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Id.* at 314. Obviously, the first statement of November 9 was not coercive. One might feel that the

deliberate act by the officers in failing to advise Dixon of his *Miranda* rights on the first interview was an improper tactic. However, Justice O'Connor, the author of *Elstad*, later declared in her dissent in *Seibert* that the state of mind of the police is irrelevant to the voluntariness of the suspect to abandon his rights. *Seibert*, 542 U.S. at 625 (O'Connor, dissenting) (citing *Moran v. Burbine*, 475 U.S. 412, 423 (1986)).

It is my belief that these facts, including (1) the passage of time between the two interviews on November 9; (2) Dixon told the officers he had talked to his attorney and wanted to make a statement; and (3) circumstances had changed between the two interviews, that is, that the officers had found the body and the likely charge would be homicide not forgery, are sufficient to dissipate the taint of the initial interview of November 9. The Ohio Supreme Court followed *Elstad* in making this determination, and I would not find that it unreasonably applied *Miranda* or *Elstad*.

Although the majority also discusses the alleged erroneous burden of proof on Dixon to show that his confession was coerced, that issue was not certified to this court and has not been raised by Dixon.

Moreover, even if there was a *Miranda* violation, the admission of the "confession at trial is subject to harmless error analysis." *Arizona v. Fulminante*, 499 U.S. 279, 303 (1991). Under *Brecht v. Abrahamson,* 507 U.S. 619 (1993), an error is harmless unless it "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637. Here, several witnesses established that Dixon stole Hammer's car about the time of his disappearance. Even more damaging, however, was the testimony of Kirsten Wilkerson, Dixon's girlfriend, who described in great detail the efforts of both Dixon and Hoffner, as well as her own participation, to kill Hammer and transport him to the burial site. Thus, the admission of Dixon's statement to the police did not have a substantial and injurious effect upon the jury's verdict.

I also respectfully disagree with the concurring opinion by my distinguished colleague in which he indicates that he not only concurs with the majority opinion on the *Miranda* issue, but that he would also grant the writ on the basis that Dixon received ineffective assistance of counsel during the mitigation phase of the trial.

Although the parties and the district court all agreed that AEDPA sets up the standard of review on this issue, and although no error was claimed either in the district court or in this court for failure to consider this under a de novo standard, the concurrence may be correct that AEDPA does not apply because the district court held an evidentiary hearing involving the testimony of several witnesses. Without deciding which standard applies, however, I would affirm the district court under either the AEDPA standard or a de novo review for the reasons set out herein. Also, like the district court, I would find that under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), Dixon has failed to show prejudice by the alleged deficient performance on the part of his counsel during the penalty phase of the trial. In determining prejudice, "a petitioner 'need not show that counsel's deficient conduct more likely than not altered the outcome of the case,' but only 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Williams v. Anderson*, 460 F.3d 789, 801-02 (6th Cir. 2006) (quoting *Strickland*, 466 U.S. at 687-88). Moreover, "the prejudice question is 'whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Smith v. Mitchell*, 348 F.3d 177, 199 (6th Cir. 2003) (quoting *Strickland*, 466 U.S. at 695). During the mitigation phase, trial counsel only presented the testimony of Sally Ann Walters concerning the significance of a sentence of life without parole for 20 years or life without parole for 30 years and a certified copy of Dixon's birth certificate to show his age. Nevertheless, counsel conducted a significant investigation through Gary Ericson, a licensed private investigator and mitigation specialist, and a psychologist, Dr. Christopher Layne.

Ericson prepared a 51-page mitigation report. He reviewed records detailing Dixon's birth, juvenile, educational, employment and psychological histories. He offered information about Dixon's family environment, including physical violence and emotional abuse from his father. He also investigated possible sexual abuse, which actually was inflicted by Dixon against a four-year-old child. Ericson found that Dixon

had been committed to a juvenile facility and earned a GED there. He also had a positive adjustment in his placement with a foster family. Ericson also found that Dixon had raped his younger sister and started taking drugs at the age of thirteen. Ericson presented his report to trial counsel, who found that Dixon did not want it to be presented to the jury. Counsel said Dixon was upset about it and would go "ballistic in the courtroom if all this information was presented at a sentencing hearing." The psychologist, Dr. Layne, had concluded before the trial that Dixon's intelligence was low-normal. He also found that Dixon had a criminal personality, called an antisocial personality disorder. He told defense counsel that he would not be helpful if called as a witness, in view of his findings. He knew that Dixon's medical records had indicated possible Reyes Syndrome as a child, but he did not find any symptoms of Reyes Syndrome. He also reasoned that Dixon did not exhibit any of the primary symptoms of brain damage. In view of this information, Dixon's counsel strategically decided not to introduce the testimony of either Ericson or Layne.

Trial counsel have an obligation to conduct a full investigation of their client's background in death penalty cases. *Williams v. Taylor*, 529 U.S. 362, 396 (2000). The district court found that the failure to use Dr. Layne as a witness was not a deficient performance, because his testimony would not have helped Dixon. On the failure to call Ericson as a witness, the court found that there was no prejudice, because evidence of a poor childhood likely would not have been sufficient to change a juror's mind. The district court found that, had the defense tried to show that Dixon was a "good guy," his previous conduct including the conviction for gross sexual imposition on a four-year-old child, "would surely have been introduced into evidence."

Although the concurrence criticizes the fact that counsel did not speak with any of the witnesses who could have testified for Dixon, the mitigation report from Ericson was a very thorough product. The law does not require that each counsel discuss with all potential witnesses what his or her testimony is supposed to be, so long as someone explores it and counsel concludes that for strategic reasons the evidence should not be introduced. Even the concurring opinion agrees that Ericson's mitigation report was a

comprehensive review of Dixon's background.  The aggravating facts of the homicide and the burial of the victim while he was still alive was such a heinous crime that it would have been difficult to find anything to mitigate the crime unless the offender was insane or mentally retarded, which was not the case here.

This case is a companion to *Hoffner v. Bradshaw*, 622 F.3d 487 (6th Cir. 2010), which recites additional facts from the trial.  Because the majority and concurrence do not discuss the other issues under the certificate of appealability, I also do not.  However, I find no merit in any of the other issues raised and would affirm the denial of the writ of habeas corpus by the district court.